Gregory Stoltz (027519)
GStoltz Law, LLC
530 Main Street, Suite B
Tucson, Arizona 85701
(520) 428-4734
greg@gstoltzlaw.com

*Attorney for Plaintiffs*
*Robert Bennetti, Linda Mariano, and Linki Peddy*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Robert Bennetti; Linda Mariano; and Linki Peddy; individually and on behalf of a class of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Mark G. Monson; David Johnson; Douglas Zimmerman; Alberto J. Tarajano; and DOES 1-25,<br><br>Defendants.<br><br>and<br><br>Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan and Trust,<br><br>Nominal Defendant | Case No.: 4:23-cv-00193-RCC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

Plaintiffs Robert Bennetti, Linda Mariano, and Linki Peddy, individually and on behalf of all similarly situated participants[1] in the Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan and Trust (the "CPES ESOP" or the "Plan") (collectively, "Plaintiffs"), hereby amend their Class Action Complaint for Violations of ERISA against Defendants Mark G. Monson, David Johnson, Douglas Zimmerman, Alberto J. Tarajano, and DOES 1-25 (collectively, "Defendants"), and for their First Amended Class Action Complaint for Violations of ERISA, allege as follows:

## INTRODUCTION

1. This action arises out the bankruptcy proceeding in the United States District Court for the Central District of California in which Community Provider of Enrichment Services, Inc., now known as CPESAZ Liquidating, Inc. ("CPES-AZ"), an Arizona corporation headquartered in Tucson, Arizona, and its wholly-owned subsidiaries, Novelles Developmental Services, Inc., now known as NDS Liquidating, Inc. ("Novelles"), and CPES California, Inc., now known as CPESCA Liquidating, Inc. ("CPES-CA") (collectively, "CPES" or the "Debtors"), filed Voluntary Petitions for Non-Individuals Filing for Bankruptcy under Chapter 11 of the United States Bankruptcy Code, now styled *In re CPESAZ Liquidating, Inc., et al.*, No. 9:20-bk-10554-DS (Jointly Administered with No. 9:20-bk-10553-DS and 9:20-bk-10994-DS) (Bankr. C.D. Cal.) (the "Bankruptcy Proceeding").

2. The Debtors were once profitable behavior health services companies; however, as a direct result of the defendants' gross mismanagement described below – including their refusal to seek advice and assistance from outside professionals in connection with a number of major non-ordinary course transactions including the valuation and sale of the enterprise –

---

[1] The Employee Income Retirement Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, defines "participants" to include "beneficiaries" **"**The term 'participant' means any employee or former employee of an employer or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, *or whose beneficiaries may be eligible to receive any such benefit.*" ERISA Section 3(7), 29 U.S.C. § 1002(7) (emphasis supplied). "The term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." ERISA Section 3(8), 29 U.S.C. § 1002(8). This Class Action Complaint for Violations of ERISA thus uses the term "participants" as including "beneficiaries".

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

the Debtors suffered irreparable financial harm that resulted in and included chapter 11 bankruptcy filings.

3. Plaintiffs bring this First Amended Class Action Complaint for Violations of ERISA ("Complaint") to remedy the violations of ERISA they discovered in and during the Bankruptcy Proceeding and after the filing of the initial Complaint herein (as further addressed in paragraph 24.f. below).

4. CPES-AZ is the corporate sponsor of the Community Provider of Enrichment Services Employee Stock Ownership Plan and Trust (the "CPES ESOP" or "Plan") and the Plan Administrator of the CPES ESOP. Since 1994, CPES-AZ has been wholly owned by the CPES ESOP. The CPES ESOP, by its ownership of CPES-AZ, wholly owned Novelles and CPES-CA.

5. The CPES ESOP is the primary, if not the sole, retirement plan for the employees of CPES-AZ. The employees of Novellus and CPES-CA are not participants in the CPES ESOP. Given the CPES ESOP's 100% ownership of CPES-AZ and the fact that CPES-AZ, Novelles, and CPES-CA have not been operating companies for some time, the assets of CPES-AZ, Novelles, and CPES-CA are the assets of the CPES ESOP.

**BACKGROUND**

6. CPES-AZ, Novelles, and CPES-CA were community human services and healthcare organizations and a provider of person-centered, trauma-informed care. CPES-AZ, Novelles, and CPES-CA historically offered a comprehensive array of behavioral health services, including outpatient mental health services, an intensive outpatient therapy program, employee assistance program services, individual and group counseling, addiction recovery programs, child and family services, foster care, training and support for people with intellectual and developmental disabilities, and vocational services. Their employee counselors and clinicians had a variety of experience and specialization. They also integrated their counseling services with overall healthcare services, and one of their core competencies was working with people who experienced multiple and severe co-occurring disorders. They operated and staffed group homes in Arizona (CPES-AZ), in Northern California (Novelles),

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

and in Southern California (CPES-CA), providing residences and services to developmentally disabled individuals, and also provided day treatment services and supportive living services. As of April 24, 2020, the date on which CPES-AZ and Novelles filed their Voluntary Petitions in bankruptcy, CPES-AZ and Novelles had approximately 962 employees. CPES-AZ had approximately 697 employees in Arizona, and Novelles had approximately 265 employees in California. CPES-CA had approximately 250 employees in California.

7. Plaintiffs and the proposed Class are participants in the CPES ESOP. They are the employee-owners of CPES-AZ, Novelles, and CPES-CA.

8. In 1994, CPES-AZ established the CPES ESOP as a retirement plan for the employees of CPES-AZ. Since then, the CPES ESOP has wholly owned CPES-AZ, and by its ownership of CPES-AZ, has wholly owned the CPES-AZ subsidiaries, Novelles and CPES-CA.

9. On April 24, 2020, following the abrupt resignation of then CPES ESOP Trustee, Defendant Tarajano, and his replacement with a successor ESOP Trustee (Miguel Paredes) on or about April 16, 2020, and without notice to or the consent of their individual employee owners, CPES-AZ and Novelles each filed a voluntary Chapter 11 bankruptcy petition in the U.S. District Court for the Central District of California, Northern Division (Santa Barbara, California) (Case Nos. 9:20-bk-10554-DS and 9:20-bk-10553-DS, respectively, and subsequently consolidated for joint administration under Case No. 9:20-bk-10554-DS).

10. On August 11, 2020, without notice to or the consent of its individual employee owners, CPES-CA also filed a voluntary Chapter 11 bankruptcy petition in the U.S. District Court for the Central District of California, Northern Division (Santa Barbara, California) (Case No. 9:20-bk-15456-SY, subsequently consolidated for joint administration with the CPES-AZ and Novelles bankruptcies under Case No. 9:20-bk-10554-DS, collectively, the "Bankruptcy Proceeding").

11. The Bankruptcy Proceeding was initiated by the CPES Board of Directors with the purpose of liquidating all or substantially all of the assets of CPES-AZ, Novelles, and CPES-CA and dissolving those corporations. The CPES Board of Directors intended to

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

liquidate these entities and because the CPES ESOP was the sole owner of CPES-AZ (which in turn owned all of Novelles and CPES-CA), any liquidation proceeds would be payable solely to the CPES ESOP.

12.    The entire pretense or pretext for the institution of the Bankruptcy Proceeding, however, was a sham and was based upon multiple substantial conflicts of interest, and to use the Bankruptcy Court to avoid the proscriptions of ERISA and Arizona state law, including to avoid seeking the consent of the CPES ESOP participants to such liquidation and dissolution, or to give them any voice whatsoever in the bankruptcy process, through a necessary direction pass-through shareholder vote, the appointment of an independent chapter 11 trustee, and to avoid the personal liabilities of the Defendants. The Bankruptcy Proceeding needlessly wasted the assets of CPES-AZ, Novelles, and CPES-CA, incurring far in excess of $3,000,000 in unnecessary administrative expenses, attorneys' fees and costs, and other presently unknown expenses – and the fair market value of the retirement accounts of their employees, the CPES ESOP participants – by transferring the exorbitant and excessive costs of the Bankruptcy Proceeding to the residual bankruptcy estate[2], i.e., to the CPES ESOP participants.

13.    When CPES-AZ and Novelles first filed the Bankruptcy Proceeding, CPES-AZ and Novelles had no real debt and their assets far outweighed any liabilities. According to the CPES-AZ Schedules of Financial Affairs ("SOFA"), CPES-AZ had slightly more than $2,900,000 in unsecured liabilities, approximately $2,400,000 of which was inter-company "debt" with CPES California. According to the SOFA, CPES-AZ described its assets as being in excess of $12,500,000. As such, no creditors committee was sought or appointed in the Bankruptcy Proceeding. Similarly, CPES-CA's assets vastly outweighed its liabilities at the time of its bankruptcy filing in 2020.

---

[2] The CPES residual bankruptcy estate is comprised of monies remaining in the CPES bankruptcy estate after the payment of the administrative claims and other claims, attorneys' fees, costs of the Liquidating Trustee and its attorneys, and any other "expenses" of the Bankruptcy Proceeding, and will inure to the benefit of the ESOP participants as the residual estate is paid to the ESOP.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

14.    Indeed, as premeditated, since the filing of the Bankruptcy Proceeding, the assets of CPES-AZ, Novelles and CPES-CA have been fully liquidated, and those entities are now liquidation entities (non-operating entities). Since then, the CPES bankruptcy estate has been depleted and has, since June 30, 2021, consistently been estimated by the Liquidating Trustee in the Bankruptcy Proceeding to be depleted from approximately $15,500,00 to $5,000,000 [CPES Bankruptcy Docket Nos. 1032, 1033, 1130, 1230, 1232, 1302, 1348, 1357], and most recently, as of July 13, 2023, to "roughly approximately" $4,750,000. Such amount likely will be considerably less than that amount when the CPES residual bankruptcy estate is actually distributed to the ESOP participants, and, if the statement of at least one member of the CPES Board of Directors is accurate, likely to be around $3,000,000.

15.    On or about September 30, 2020, all or substantially all of the assets of Novelles and CPES-CA were liquidated in the Bankruptcy Proceeding.

16.    On or about October 15, 2020, all or substantially all of the assets of CPES-AZ were liquidated in the Bankruptcy Proceeding.

17.    On May 10, 2021, over the objection of the individual named Plaintiffs here and 92 other CPES ESOP participants, the Bankruptcy Court approved the Debtors' (CPES-AZ's, Novelles's and CPES-CA's) proposed First Amended Joint Chapter 11 Plan of Liquidation, as Modified [CPES Bankruptcy Docket No. 802, the "CPES Plan of Liquidation"; CPES Bankruptcy Docket No. 836, the "Confirmation Order", dated May 10, 2021].

18.    The Plan of Liquidation became effective on or about June 17, 2021. [CPES Bankruptcy Docket Nos. 900 and 915.]

19.    The Debtors ceased to be "operating companies" – a defined term in the context of ESOPs and in the context of the U.S. Department of Labor's Plan Asset regulations, 29 CFR § 2510.3-101 – when the Board of Directors of Debtors developed a strategic planning effort focused on the liquation of the Debtors and the sale of substantially all of the assets of the Debtors, believed to be at least as early as 2018. To that end, the Ninth Circuit has recognized that the general rule that corporate assets are not plan assets where the plan is an ESOP (29 C.F.R. § 2510.3-101(h)(3)) is inapplicable in the context of a 100% ESOP-owned

FIRST AMENDED CLASS ACTION
                    COMPLAINT FOR VIOLATIONS OF ERISA

company taking actions towards liquidation when the ESOP will be the sole beneficiary of the liquidation proceeds. *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009). Moreover, 29 CFR § 2510.3-101(a)(2) provides:

> "Generally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. In the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security nor a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that – (i) The entity is an operating company, or (ii) Equity participation in the entity by benefit plan investors is not significant. Therefore, any person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the investing plan."

20.     As such, the assets of CPES-AZ, Novelles, and CPES-CA became the assets of the CPES ESOP when the Debtors were no longer operating companies, which occurred when the Board of Directors of Debtors developed a strategic planning effort focused on the liquation of the Debtors and the sale of substantially all of the assets of the Debtors, believed to be at least as early as 2018.

21.     Under the Plan of Liquidation in the Bankruptcy Proceeding, a Liquidating Trustee (Oxford Restructuring Advisors, LLC) was appointed. [CPES Bankruptcy Docket Nos. 802 and 836.]

22.     Upon the effective date of the Plan of Liquidation, June 17, 2021, the Liquidating Trustee succeeded to CPES-AZ, Novelles, and CPES-CA, including, without limitation, in CPES-AZ's role as Plan Administrator of the CPES ESOP. [CPES Bankruptcy Docket No. 802, at Article IV, and CPES Bankruptcy Docket No. 915.]

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

23.    Under the Plan of Liquidation, as of the confirmation date of the Plan of Liquidation, May 10, 2021, the CPES ESOP formally terminated. [CPES Bankruptcy Docket No. 802, at ¶ 5.7.] The CPES ESOP Employee Stock Ownership Trust was unaffected and continues. [*Id.*] Plaintiffs assert, however, that the filing of the Bankruptcy Proceeding constituted a termination or partial termination of the CPES ESOP [CPES ESOP Plan Document, at Section 19 (Future of the Plan) ("A complete discontinuance of Employer Contributions shall be deemed to be a termination of the Plan for this purpose.").]

24.    a.    This First Amended Class Action Complaint for Violation of ERISA arises out of information that Plaintiffs and 92 other CPES ESOP participants learned during the CPES Bankruptcy Proceeding, and subsequently confirmed by the Liquidating Trustee, namely, that the valuation of CPES-AZ and the CPES ESOP's assets as of December 31, 2018, was improperly and intentionally inflated, contained mistakes, inappropriately changed valuation methodologies and instead used incorrect valuation methodologies, and was incorrect and that, as a result, distributions to certain CPES ESOP participants were made at improperly inflated values, to the detriment of the CPES ESOP.

b.    Defendant Monson testified to this under oath during the Bankruptcy Proceeding on May 28, 2020, at the 341(a) initial Meeting of Creditors therein.

c.    This factual information also was confirmed by the present trustee of the CPES ESOP (Miguel Paredes), who was not initially involved in the December 31, 2018, year-end valuation process and who was retained as "Successor" ESOP Trustee on or about April 16, 2020, eight days before the initial bankruptcy filings.

d.    The present CPES ESOP Trustee, however, has not provided Plaintiffs with any information with respect to his efforts, if any, to correct the improper December 31, 2018, year-end valuation, by seeking to bring the claims herein against the parties personally responsible for the ERISA violations, namely, the Defendants.

e.    Moreover, as of the date of the initial filing of this action, the Liquidating Trustee had not provided Plaintiffs with any information with respect to its efforts, if any, to correct the improper December 31, 2018, year-end valuation, by seeking to bring the claims

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

herein against the parties personally responsible for the ERISA violations, namely, the Defendants.

f.      On or about June 28, 2023, Plaintiffs also learned that the Liquidating Trustee prepared a proposed complaint, to be brought as an adversary action in the bankruptcy proceeding, and a demand letter, which the Liquidating Trustee sent to the D&O Complaint defendants (collectively, the "D&O Complaint"). Attached, collectively, as Exhibit "A" is a copy of the Liquidating Trustee's proposed complaint and its demand letter.

25.      In addition, this action alleges that CPES-AZ, then the Plan Administrator of the CPES ESOP and the corporate sponsor of the CPES ESOP, acting though one or more of the Defendants, timely failed to provide proper disclosures required by ERISA. The ESOP Plan Administrator and other parties failed (i) to timely and properly determine in good faith the fair market value of the CPES ESOP plan sponsor since December 31, 2019, (ii) to have timely filed certain of the required IRS Forms 5500 (Annual Return/Report of Employee Benefit Plan ("Form 5500") with the U.S. Department of Labor (the "DOL") for the CPES ESOP, namely, the 2020 Form 5500, due on or before October 15, 2021, and the 2021 Form 5500, due on or before October 15, 2022, and (iii), until after December 16, 2022, failed to provide the CPES ESOP participants with participant account statements since they did so in 2019 for the 2018 plan year. The ESOP Plan Administrator is required to provide participant account statements to the ESOP participants each year. 29 U.S.C. § 1025(a)(1)(A)(ii). The Plaintiffs and all CPES ESOP participants each have had a pressing need for an accounting of their retirement benefits in the form of their participant account statements, including at significant times such as upon their termination of employment from CPES-AZ, any disability, and/or their vesting upon the filing of the Bankruptcy Proceeding (if not sooner). Because the Plaintiffs and all CPES ESOP participants have been unable to receive such an accounting, their financial planning has been impaired and their effort to enforce the rights and fiduciary obligations imposed by ERISA have been severely hampered.

26.      Moreover, the proofs of claim in the Bankruptcy Proceeding filed by or on behalf of the CPES ESOP participants (whether individually or as part of a "class claim") and the

proof of claim filed by the present CPES ESOP Trustee [CPES Bankruptcy Claim No. 274] did not and do not provide for the relief requested herein.

27.     Accordingly, in order to preserve and enforce their rights and those of all of the CPES ESOP participants, Plaintiffs bring this action for the benefit of the Plan.

28.     To that end, the Bankruptcy Court's Confirmation Order expressly provides that "[n]othing in the Plan or this Confirmation Order will affect the rights of any CPES ESOP participant or beneficiary with respect to any claims or causes of action held by any CPES ESOP participant or beneficiary, to the extent any such claims or causes of action exist". [CPES Bankruptcy Docket No. 836, at ¶ 37.] The claims and causes of action set forth herein under ERISA Sections 502(a) and 502(c), 29 U.S.C. §§ 1132(a) and 1132(c), are such claims or causes of action.

29.     This class action is thus brought under ERISA Sections 404, 405, 409, 502(a), and 502(c)(1)(A), 29 U.S.C. §§ 1104, 1105, 1109, 1132(a), and 1132(c)(1)(A), for losses suffered by the Plan and its participants, and other relief, caused by Defendants. The Plan has been injured and its participants have been deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA. Plaintiffs thus bring this action under ERISA to vindicate their rights to be free from Defendants' various breaches of ERISA, including their ERISA fiduciary duties, and to seek recovery on behalf of the Plan from those who are personally liable to make good such losses.

30.     When ERISA's strict fiduciary standards are not satisfied, ERISA permits the participants of an ERISA plan (here, the CPES ESOP) to seek relief under ERISA Sections 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), to restore plan losses, to recover unjust profits and to obtain other remedial and equitable relief as a court may deem appropriate.

31.     Not only may fiduciaries be held directly responsible for losses and other relief for their own misconduct, but their co-fiduciaries also may be held liable for losses and other relief when those co-fiduciaries participate in, enable or fail to remedy another fiduciary's breach. ERISA Section 405(a)(1)-(3), 29 U.S.C. § 1105(a)(1)-(3).

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

32.     Plaintiffs also bring this action under ERISA under the authority of *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which involved a defined contribution plan like the CPES ESOP, and further demonstrated that "[ERISA] §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses caused by a fiduciary breach". *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

## JURISDICTION AND VENUE

33.     Subject Matter Jurisdiction. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and ERISA Section 502(e)(2), 29 U.S.C. §1132(e)(2).

34.     Personal Jurisdiction. This Court has personal jurisdiction over Defendants under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), which provides for nationwide service of process.

35.     Venue. Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because (i) the Defendants' breaches and violations of ERISA occurred in this District and/or affected those CPES ESOP participants in this District, (ii) because the CPES ESOP was administered in this District, and (iii) because at least one of the Defendants may be found in this District.

## THE PARTIES

### A.     The Plaintiffs

36.     The named Plaintiffs and the proposed Class members are all participants or beneficiaries in the CPES ESOP, as defined by ERISA Section 3(7) and (8), 29 U.S.C. § 1002(7) and (8), who were vested in shares of CPES allocated to their accounts in the Plan. There are believed to be in excess of 1,300 current and former CPES-AZ employees who are participants or their beneficiaries in the CPES ESOP.

37.     Plaintiff Robert Bennetti is a former employee of CPES-AZ. Mr. Bennetti is a participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7). He resides in Tucson, Arizona.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

38.     Plaintiff Linda Mariano is a former employee of CPES-AZ. Ms. Mariano is a participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7). She resides in Tucson, Arizona.

39.     Plaintiff Linki Peddy is a former employee of CPES-AZ. Ms. Peddy is a participant of the CPES ESOP within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7). She resides in Tucson, Arizona.

### B.     The Defendants

40.     Defendant Mark G. Monson is believed to now be a resident of Wisconsin and to reside in or around Land O' Lakes, Wisconsin. Defendant Monson is subject to the jurisdiction and venue of this Court under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

41.     Defendant David Johnson is a resident of Arizona and resides in or around Tucson, Arizona. Defendant Johnson is subject to the jurisdiction and venue of this Court under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

42.     Defendant Douglas Zimmerman is a resident of Arizona and a resides in or around Tucson, Arizona. Defendant Zimmerman is subject to the jurisdiction and venue of this Court under ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2).

43.     Defendant Alberto J. Tarajano is believed to be a resident of either Florida or North Carolina and resides either in or around Key Biscayne, Florida or Chapel Hill, North Carolina. He is subject to the jurisdiction and venue of this Court pursuant to 28 U.S.C. § 1390, 29 U.S.C. § 1132(e)(2).

### C.     The Board Defendants

44.     At all times relevant, Defendant Johnson (as Chairman of the CPES Board of Directors), Defendant Monson (as CPES Chief Executive Officer), and Defendant Zimmerman were members of the Board of Directors of CPES-AZ (collectively, the "Board Defendants").

45.     As more fully described herein, the Board Defendants were and have been fiduciaries of the CPES ESOP within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### D.     The CPES ESOP

46.     Since 1994, all of the shares of CPES capital stock have been held by the CPES ESOP. The present CPES ESOP was adopted as an amendment and restatement of the Community Psychology & Education Services, Ltd. Employee Stock Ownership Plan, which originally was adopted on May 31, 1995, effective as of July 1, 1994. As of July 1, 2004, the CPES ESOP was renamed the CPES Employee Stock Ownership Plan.

47.     Nominal Defendant the CPES ESOP is an "employee pension benefit plan" within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). The CPES ESOP is a "defined contribution plan" within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), and an employee stock ownership plan under ERISA Section 407(d)(6), 29 U.S.C. § 1107(d)(6), that was intended to meet the requirements of Section 4975(e)(7) of the Internal Revenue Code (the "Tax Code") and IRS Regulations § 54.4975-11. The CPES ESOP is a stock bonus plan under 29 U.S.C. § 401(a). The CPES ESOP Trust established under the CPES ESOP was designed to invest primarily in CPES Stock.

48.     The CPES ESOP is named as a nominal defendant pursuant to Federal Rule of Civil Procedure 19 to ensure that complete relief can be granted as to Plaintiffs' claims and those brought on behalf of the Class.

49.     The written instrument by which the CPES ESOP is maintained within the meaning of ERISA Section 402, 29 U.S.C. § 1102, is the "Community Provider of Enrichment Services, Inc. Employee Stock Ownership Plan, as Amended and Restated, Effective January 1, 2015 (Except as otherwise indicated herein)", including "Amendments 1-4 incorporated into Plan Document" (collectively, the "CPES ESOP Plan Document").

50.     Essentially, after an employee satisfies certain eligibility requirements under the CPES ESOP Plan Document, the employee automatically becomes a CPES ESOP participant and thereafter becomes a beneficial owner of CPES through allocations of CPES stock pursuant to the terms of CPES ESOP Plan Document, ERISA, and the U.S. Tax Code. The Plaintiffs and the proposed Class members have all satisfied the necessary eligibility requirements and are vested participants in or beneficiaries of the CPES ESOP.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

51.    The CPES ESOP is governed by ERISA, the CPES ESOP Plan Document, the "CPES Employee Stock Ownership Trust Agreement", dated May 13, 2016 (the "CPES ESOP Trust Agreement"), and the "CPES Employee Stock Ownership Plan Distribution Policy, Effective for Distributions Made on/After October 23, 2019" (the "Distribution Policy"), and, to the extent not superseded by ERISA, Arizona state law.

52.    Notice of such governing documents was and is provided to the CPES ESOP Participants in the "Summary Plan Description for the CPES Employee Stock Ownership Plan, as Revised Effective October 1, 2016" (the "CPES ESOP Summary Plan Description").

53.    In summary, the CPES ESOP Plan Document and the CPES ESOP Plan Trust Agreement describe the administration of the CPES ESOP, the holding of CPES-AZ stock under trust, and the rights and obligations of certain individuals thereunder.

54.    The purpose of the CPES ESOP was "to enable participating [CPES-AZ] Employees to share in the growth and prosperity of CPES[-AZ] and to provide Participants with an opportunity to accumulate capital for their future economic security. The primary purpose of the Plan [was] to enable [CPES ESOP] Participants to acquire stock ownership interests in CPES[-AZ]". [CPES ESOP Plan Document, at Section 1 (Nature of Plan).] The CPES ESOP also was designed, among other things, "[t]o provide Participants with beneficial ownership of CPES[-AZ] Stock, substantially in proportion to their relative Compensation and years of Credited Service". [*Id.*]

### E.    The CPES ESOP Plan Administrator

55.    The Plan Administrator of the CPES ESOP has exclusive responsibility and authority to control and manage the operation and administration of the Plan.

56.    Under the CPES ESOP Plan Document, CPES-AZ, the Plan Sponsor of the CPES ESOP, was designated as the Plan Administrator. [CPES ESOP Plan Document, at Section 2 (Definitions) ("CPES shall be the Plan Administrator (as defined in Section 3(16)(A) of ERISA and Section 414(g) of the Code) for purposes of the reporting and disclosure requirements of ERISA and the Code. See Section 16.(h).").]

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

57.    The duties of the CPES ESOP Plan Administrator are varied, and include, among other things: (i) reviewing and signing the annual Form 5500; (ii) approving or rejecting distributions to the CPES ESOP participants in accordance with the CPES ESOP Plan Document and Trust Agreement; (iii) fixing Plan operational and compliance errors; (iv) monitoring and ensuring adequate CPES ESOP participant education; (v) tracking, applying, and communicating eligibility rules and actions to the CPES ESOP participants; (vi) selecting, documenting, and evaluating Plan service providers; (vii) providing all Plan service providers with complete and identical plan documentation; (viii) performing and documenting annual reviews of all Plan service providers; (ix) assuring and documenting all Plan notifications and communications to the CPES ESOP participants; (x) storing, maintaining, and assuring compliance with the CPES ESOP Plan Document and Trust Agreement; (xi) ensuring annual custodian issuance of 1099-R statements to all CPES ESOP participants; (xii) approving all Plan expenses paid from Plan in accordance the CPES ESOP Plan Document and Trust Agreement; (xiii) monitoring and benchmarking fees and expenses paid from Plan assets; (xiv) reviewing and ensuring that billings and expenses are correct and accurate; and (xv) responding to CPES ESOP participant or Plan sponsor questions in timely manner.

58.    Under ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A), "the term 'administrator' means—(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe. *See also* 29 CFR § 2510.3-16.

59.    Under ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B), "[t]he term 'plan sponsor' means (i) the employer in the case of an employee benefit plan established or maintained by a single employer.

60.    Under ERISA Section 3(5), 29 U.S.C. § 1002(5), "[t]he term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in

relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."

61.    At all times relevant, the Board Defendants were persons acting indirectly in the interest of any employer in relation to the CPES ESOP and controlled the actions of the CPES ESOP Plan Administrator.

62.    The CPES ESOP Plan Document contemplates that an ESOP Administrative Committee would administer the Plan. [CPES ESOP Plan Document, at Section 16(a) ("The members of the Committee shall be the named fiduciaries with authority to control and manage the operation and administration of the Plan. Members of the Committee need not be Employees or Participants").]

63.    The CPES ESOP Plan Document also contemplates that the members of such ESOP Administrative Committee would be ERISA fiduciaries. [*Id.*, at Section 16(c) ("The Committee shall perform its duties under the Plan and the Trust Agreement solely in the interests of the Participants (and their Beneficiaries). Any discretion granted to the Committee under any of the provisions of the Plan or the Trust Agreement shall be exercised only in accordance with rules and policies established by the Committee which shall be applicable on a nondiscriminatory basis. The Committee shall have the sole and exclusive authority to construe, interpret and apply the terms of the Plan. The Committee shall be given the greatest possible deference permitted by law in exercise of such discretionary authority").]

64.    The CPES ESOP Administrative Committee, however, did not actually perform the contemplated functions of such Committee and was illusory. The CPES Board of Directors and the Board Defendants performed such functions instead.

65.    Thus, for example, while the CPES ESOP Plan Document contemplates that the CPES ESOP Administrative Committee would conduct annual valuations of the fair market value of CPES common stock for purposes of the annual Form 5500 filings and for other purposes [*Id.*, at Section 2 (Definition of "Fair Market Value") ("The fair market value of CPES Stock (and/or other Trust Assets as appropriate), as determined by the Committee in good faith (as described in U.S. Treasury Department Regulations Section 54.4975-11(d)(5))

for all purposes under the Plan based upon a valuation by an independent appraiser (as defined in Section 401(a)(28)(C) of the [U.S. Tax] Code) on an enterprise basis as of the Valuation Date"), the CPES ESOP Administrative Committee did not actually perform the contemplated functions of such Committee and was illusory. The CPES Board of Directors and the Board Defendants instead performed such functions. Defendant Tarajano also conducted the annual valuation of the fair market value of CPES common stock for purposes of the 2018 annual Form 5500 filing and actively participated in and conspired with the CPES Board of Directors and the Board Defendants in that regard and as set forth herein.

66.    Similarly, while the CPES ESOP Plan Document contemplates that the CPES ESOP Administrative Committee would direct the CPES ESOP Trustee with respect to certain functions [*see*, *e.g.*, *id.*, at Sections 5(c), 11, 13, 16(c), 16(e), 16(g), 16(i)], the CPES ESOP Committee did not actually perform the contemplated functions of such Committee and was illusory. The CPES Board of Directors and the Board Defendants instead performed such functions. Again, Defendant Tarajano also conducted the annual valuation of the fair market value of CPES common stock for purposes of the 2018 annual Form 5500 filing and actively participated in and conspired with the CPES Board of Directors and the Board Defendants in that regard and as set forth herein. Defendant Tarajano was not permitted under ERISA to take directions that he knew or reasonably should have known violated ERISA.

67.    At all times relevant, Monson and the Board Defendants were acting as Plan Administrator of the CPES ESOP and, as such, were ERISA fiduciaries.

### F.    The Trustee Defendant

68.    At all times relevant, Defendant Tarajano served as a trustee of the CPES ESOP (the "Trustee Defendant").

69.    In or about January 2019, CPES-AZ contacted Defendant Tarajano for the purpose of becoming an ESOP Trustee for the purposes of evaluating an offer made to CPES-AZ for the purchase of either all of the stock of CPES-AZ or all of substantially all of the assets of CPES-AZ, Novelles, and CPES-CA, and otherwise being the independent fiduciary and trustee of the CPES ESOP. In or about April 2019, CPES-AZ hired Defendant Tarajano

to become the CPES ESOP Trustee. On or about August 6, 2019, CPES and the Board Defendants later "papered" that hiring with a retention agreement notwithstanding that Defendant Tarajano had assumed such duties in or about April 2019.

70.    On or about April 16, 2020, Defendant Tarajano abruptly "resigned" and the Board Defendants replaced him with a successor ESOP Trustee (Miguel Paredes).

71.    Pursuant to Section 16 of the CPES ESOP Plan Document, the Trustee Defendant is a named fiduciary of the CPES ESOP within the meaning of ERISA Section 402, 29 U.S.C. § 1102. Defendant Tarajano also was, at all times relevant, a fiduciary of the CPES ESOP within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

72.    The Board Defendants also acted as a *de facto* CPES ESOP Trustee, especially during the bankruptcy, to the extent that they controlled and/or directed any other CPES ESOP Trustee. To that extent, the Board Defendants also are included as "Trustee Defendants".

### G.    The DOE Defendants

73.    Plaintiffs do not presently know the identity of other individuals involved in the events described herein. When Plaintiffs ascertain the identities of those not currently named, if any, Plaintiffs will either amend without leave as permitted or seek leave to join them under their true names.

## ADDITIONAL FACTUAL ALLEGATIONS

74.    Plaintiffs allege the following additional allegations, based in part upon their own discovery in the CPES bankruptcy proceeding and based upon the allegations of the Liquidating Trustee's D&O Complaint.

75.    CPES experienced several non-ordinary course events that weakened its financial position on or before a subset of Defendants originally filed the Bankruptcy Proceeding in April of 2020.

76.    As alleged in the D&O Complaint, the Board Defendants here, "completely abdicated their fiduciary duties in addressing" any of CPES's concerns over CPES-AZ's liquidity and "grossly mismanaged CPES' financial affairs in critical times".

**The Bank of the West Line of Credit**

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

77.    Up and until some point in 2019 when it was unilaterally closed by the bank, CPES utilized a line of credit open with Bank of the West ("Line of Credit").

78.    The Line of Credit was integral to CPES's management of cash flow, which comprised of somewhat unpredictable and delayed insurance reimbursements on the revenue side and regular ordinary course obligation on the expense side.

79.    By way of example, one of the CPES's largest ordinary course expenses was payroll, which according to the books and records reviewed by the Liquidating Trustee, amounted to $2 million per pay period.

80.    Again, as a result of the unpredictable and delayed nature of their revenue, the Line of Credit was essential to CPES's ability to timely meet those payroll obligations, as well as other ordinary course expenses.

81.    Nevertheless, after Bank of the West closed the Line of Credit in 2019, the Board Defendants failed to secure replacement financing from another financial institution, evidencing that the Board Defendants had undertaken to liquidate the operations of CPES rather than to continue the business operations of CPES.

82.    By way of example, the Board Defendants never retained a broker, investment banker, or other professional to assist CPES in seeking replacement financing.

83.    Instead, the Board Defendants presumed, without any concrete data, advice, or diligence, that no other financial institution would lend to CPES on a secured or unsecured basis, and the Board Defendants instead sought to sell or liquidate the CPES assets.

84.    To be certain, although the CPES entities were experiencing liquidity issues, their balance sheet was healthy and CPES owned a number of unencumbered real estate assets that could have served as collateral for a new loan. CPES, acting through the Board Defendants, chose to liquidate these assets instead of using them for such collateral.

85.    The Board Defendants never did obtain replacement financing for CPES.

### The Sale/Leaseback of the Debtors' Real Estate

86.    In order to generate cash to meet operational shortfalls and allow the operations of the business to be sold to third parties in pursuit of a plan to liquidate the business

operations, the Board Defendants authorized CPES-AZ to enter into a series of transactions where it sold between 30-32 Arizona properties (the "Properties") to CapGrow Holdings JV Sub IV LLC ("CapGrow") from 2018 through 2019 and contemporaneously leased the Properties back to continue their operations at those particular sites (collectively, the "Sale/Leaseback Transactions").

87.    The Sale/Leaseback Transactions were far outside the ordinary course of CPES's business and would not have been pursued other than to secure liquidity as part of the overarching goals of the CPES Board of Directors to wind down the corporate operations through sales to third parties.

88.    Despite the non-ordinary course nature of the Sale/Leaseback Transactions, the Board Defendants failed to engage any professionals to advise the Debtors in connection with the transactions.

89.    That error was particularly egregious given the liquidity issues that CPES were experiencing. CPES could hardly afford to part with assets without maximizing their value. Nor could they afford to take on any further onerous obligations. Moreover, and probably because no outside professional was involved, it does not appear that the Board Defendants gave any consideration to a sale of the enterprise at this critical juncture before parting with material assets. The Sale/Leaseback Transactions materially impaired the balance sheet of CPES and reduced the value achievable through any sale of the enterprise as a whole. The Sale/Leaseback Transactions also unnecessarily risked future revenue streams by subjecting the revenue-generating Properties to onerous lease terms, which, once in default, could be repossessed by the landlord.

90.    By way of example, the Board Defendants failed to retain (a) a broker or real estate agent to assist them with the marketing and sale of the Properties, (b) an appraiser to value the Properties, or (c) an accountant to conduct a feasibility study with respect to the lease obligations incurred by CPES in connection with the proposed Sale/Leaseback Transactions.

91.    Instead, and without the assistance of the proper professionals, the Board Defendants solicited offers from one or two known entities (as opposed to a running an orderly

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

sale process), exclusively relied on CapGrow's valuation of the Properties (as opposed to independently assessing the value of the Properties), and committed CPES to obligations beyond their ability to repay in the near-term (as opposed to negotiating affordable rental terms or financial terms tied to revenue, for example).

92.   Even though the sale of the Properties provided for an immediate cash infusion, the effects of that cash infusion were short-lived and CPES were back in the same financial distress situation within a relatively short period.

93.   It is clear that the Board Defendants took the offer from CapGrow simply to address CPES's short-term financial problems without regard to the long-term effects, including the impact of the Sale/Leaseback Transactions on the value of the enterprise.

94.   Were it not for the imprudent and ill-advised Sale/Leaseback Transactions, CPES would have had significantly higher going-concern value in their efforts to sell the equity and/or assets of the enterprise.

95.   Furthermore, as a result of the Sale/Leaseback Transactions, CPES no longer had significant real estate assets to secure replacement financing when Bank of the West terminated the Line of Credit.

96.   CPES eventually defaulted on the leases with CapGrow.

97.   As further evidence of the poor terms of the leases, all but three (3) of the leases with CapGrow were ultimately rejected in the Bankruptcy Proceeding, which resulted in significant lease rejection damages against the bankruptcy estates.

98.   CapGrow filed proofs of claim in the CPES-AZ bankruptcy case for unpaid lease payments and rejection damages totaling approximately $585,817.70.

**The Failed Pre-petition Sale to National Mentor Health Care, LLC**

99.   As a result of the Board Defendants' previous failures to secure replacement financing and the reckless Sale/Leaseback Transactions, CPES was faced with no available credit and growing operating expenses.

100.   Against this backdrop, the Board Defendants finally turned their attention to a sale of the enterprise.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

101. Unfortunately, the Board Defendants did not act in a reasonably prudent manner in their efforts to sell CPES's business as a going concern.

102. Mr. Monson testified in the Bankruptcy Proceeding that National Mentor Health Care, LLC ("Mentor") initially solicited him for a potential purchase of CPES's business operations back in 2015 when he began his employment with CPES and prior to the financial difficulties he oversaw.

103. Beginning sometime in 2019 and continuing through approximately March or April 2020, the CPES Board of Directors entertained at least one offer to purchase the stock of CPES-AZ, including Novelles and CPES-CA, for at least $12,250,000 from National Mentor Holdings, LLC, and believed to approximately be upwards of $15.05 per share.

104. Emblematic of the same inappropriate decision-making of the Board Defendants through the credit crunch described above, Mr. Monson testified in the Bankruptcy Proceeding that, rather than retain and consult with professionals, he initiated contact with Mentor in 2019. CPES (through the Board Defendants) and Mentor thereafter commenced negotiations.

105. Prior to and during the Mentor sale negotiations, the Board Defendants did not engage an investment banker or other professional sales consultant to assist with the marketing and sale of CPES's business as a going concern.

106. Nor did the Board Defendants run a prudent or appropriate sale process.

107. Nor did the Board Defendants obtain a formal valuation or appraisal of CPES's business as a going concern.

108. Instead, the Board Defendants improperly relied on the 2018 year-end appraisal conducted for purposes of ESOP reporting requirements to value the CPES-AZ stock.

109. The 2018 year-end appraisal, a complex valuation created by an independent appraisal firm, was not a proper or reliable valuation tool for valuing a business as a going concern for a stock sale, nor conducted in an appropriate or permissible manner under ERISA.

110. The 2018 year-end appraisal improperly valued the CPES-AZ stock at approximately $12.00 per share.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

111. Mentor's initial purchase offer is believed to have valued the CPES at approximately $15.00 per share, or roughly $13,686,525.

112. After the Board Defendants had engaged in approximately six months of negotiations with Mentor without the assistance of experienced investment banking or other sales professionals, Mentor advised the Board Defendants that it no longer wished to pursue the sale in late March or early April of 2020.

113. The Board Defendants made no efforts to identify an alternative buyer for either CPES's equity or their assets.

114. In or about January 2019, CPES-AZ apparently contacted Defendant Tarajano for the purpose of becoming the ESOP Trustee and ostensibly to evaluate the Mentor offer.

115. In or about April 2019, CPES-AZ (through the Board Defendants) hired Defendant Tarajano to become the CPES ESOP Trustee.

116. On or about August 6, 2019, CPES and the Board Defendants later retroactively "papered" that hiring with a retention agreement notwithstanding that Defendant Tarajano had assumed such duties in April 2019.

117. As set forth in the Tarajano Trustee Services Agreement, the Board Defendants were "evaluating a transaction or series of transactions whereby National Mentor Holdings LLC or its affiliate … would either (a) acquire the stock of the Company [CPES] from the CPES Employee Stock Ownership Trust [], which implements and forms a part of the CPES Employee Stock Ownership Plan [] or (b) acquire all or substantially all of the assets of the Company [CPES] and its Subsidiaries [Novelles and CPES California]". [Tarajano Trustee Services Agreement, dated August 6, 2019, at Recital 1.]

118. In addition to all of the powers and obligations under the CPES ESOP Plan Document and the CPES ESOP Trust Agreement, Defendant Tarajano was required to engage a qualified independent appraiser so that he could evaluate the proposed transaction. [*Id*., at Section 3.] Instead, either at the insistence of the CPES Board of Directors or with their consent, Defendant Tarajano used an appraiser (Brueggeman and Johnson Yeanoplos, P.C.)

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

that already had been hired by the CPES Board of Directors and had been used by CPES-AZ to conduct valuations of CPES-AZ for a number of previous years.

119. Based upon the sworn testimony of Defendant Tarajano in the Bankruptcy Proceeding, the initial proposed appraisal conducted by Brueggeman and Johnson Yeanoplos, P.C., in approximately early May, 2019, valued the shares of CPES-AZ at $5.92 per share, or, based upon 912,435 issued and outstanding shares of CPES-AZ, valued CPES-AZ at approximately $5,401,615.20.

120. The Trustee Defendants and the Board Defendants, however, improperly inflated and increased that valuation to $12.04 per share, or, based upon 912,435 issued and outstanding shares of CPES-AZ, valued CPES-AZ at approximately $10,990,000. Without justification or excuse, they unilaterally changed or caused to be changed the methodologies and methods of appraisals previously used by Brueggeman and Johnson Yeanoplos, P.C. from a combination of Discounted Cash Flow method (weighed at 75%) and Guideline Public Companies method (weighed at 25%) to a 100% weighted asset-based method, and included incorrect assumptions and contained errors, including improperly subscribing value to the CPES workforce as an intangible asset in violation of accepted and best practices.

121. The appraisal of CPES-AZ as of December 31, 2018, formed the basis of the CPES ESOP's 2018 year-end Form 5500 filing with the DOL on or about October 10, 2019, and signed by Defendant Monson. The 2018 Form 5500 for the CPES ESOP sets forth that, as of December 31, 2018, the CPES shares of common stock owned by the CPES ESOP Participants were valued by the CPES ESOP Board of Directors and the ESOP Trustees at $12.04. That share price was then promoted on the CPES website with the claim that "our share price has recently increased by 18.74%" (formerly https://www.cpes.com/employees) until the CPES website was removed. The publicly available report filed with the DOL shows the aggregate value of CPES shares as of December 31, 2018 as $10,985,723, and the number of shares of company stock held by the CPES ESOP as 912,435, consistent with the $12.04 per share price on the statements therein.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

122.   Based upon that inflated appraisal, Defendants caused CPES-AZ to pay inflated distributions to certain CPES ESOP participants in an amount to be further determined at trial but believed to be in excess of $327,304.29. CPES-AZ and the CPES ESOP are believed to have paid in excess of $644,299.78 in distributions based upon the 2018 Form 5500 valuation. As such, the approximate amount of the overpaid distributions based upon that valuation is at least $327,304.29.

123.   Consistent with this, on May 28, 2020, at the initial 341(a) Meeting of Creditors in the bankruptcy proceeding, CPES CEO Defendant Monson, was questioned, and, among other things, provided sworn information (i) that the Debtors' management had been trying to sell CPES for many months; (ii) that CPES was going to file motions to sell CPES through a Section 363 sale; and (iii) that 2018 year-end valuation of CPES upon which the CPES ESOP 2018 Form 5500 was based was intentionally inflated.

124.   In addition, on May 28, 2020, at the initial 341(a) Meeting of Creditors in the Bankruptcy Proceeding, Defendant Monson testified that, prior to the Board Defendants' and Trustee Defendants' acceptance and approval of the valuation of CPES as of December 31, 2018, the independent appraiser for the CPES ESOP servicing the Trustee Defendants identified an approximately forty (40%) reduction in the fair market value of the CPES stock held by the CPES ESOP from the previous year as appropriate for December 31, 2018, consistent with Defendant Tarajano's testimony of a proposed reduction in value from $10.14 per share in 2017 to $5.92 per share in 2018. The change in valuation methodology implemented by Defendant Tarajano, Defendant Monson, the Board Defendants and the Trustee Defendants resulted in an increase in value by approximately 23% from the previous year, a sixty-three percent (63%) difference from what Defendant Monson testified the CPES stock was worth as of December 31, 2018, during his May 28, 2020, testimony. The 2018 Form 5500 audit report reflects this shift in valuation methodology, stating:

> As of December 31, 2018, the appraisal was based upon the cost or asset approach. The appraiser took into account the sponsor's individual assets and liabilities and adjusting them to reflect their fair value.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

As of December 31, 2017, the appraisal was based upon a combination of the market and income valuation techniques consistent with prior years. The appraiser took into account historical and projected cash flow and net income, invested capital, weighted average cost of capital, and market comparables.

[2018 Form 5500, p. 29 of 36.]

125.   The CPES Board of Directors and the Board Defendants refused to assist the Plaintiffs and the ESOP Participants to further corroborate this information. Moreover, until on or after December 16, 2022, the CPES Plan Administrator, namely, the CPES Board of Directors and the Board Defendants, failed to provide the CPES ESOP participants, including the Plaintiffs and the proposed Class, with their CPES ESOP participant account statements since the 2018 ESOP Plan year, in 2019.

**Management's Failure to Secure CARES Act Relief**

126.   CPES's largest obligation was payroll, which cost the Debtors $2 million per pay period.

127.   Based on the Liquidating Trustee's investigation, despite widely publicized forgivable federal loans and tax credits available to CPES, the Board Defendants made little effort to secure such funding.

128.   CPES's CFO, Mr. Zimmerman, testified in the Bankruptcy Proceeding that he was not involved in any application process.

129.   As a result, and similar to the line of credit woes discussed above, the Board Defendants did not secure any relief on behalf of CPES.

130.   Nor does it appear that the Board Defendants took any measures to address their mounting liabilities in the face of the Pandemic.

131.   Indeed, as the Liquidating Trustee represents, it does not appear from the minutes of the CPES Board of Directors' meetings that the Board Defendants considered any revenue maximizing alternatives or cost-cutting measures in the wake of the Pandemic, and that when all other businesses around the globe were scrambling to find ways to keep their businesses afloat, it does not appear that the Board Defendants considered any such efforts.

FIRST AMENDED CLASS ACTION
                                    COMPLAINT FOR VIOLATIONS OF ERISA

The Board Defendants were intent on liquidating the business operations long prior to this time and did not consider the benefits of the Pandemic relief that was available to any of the CPES entities during this period based on its payroll that remained.

132.    Had they engaged in any customary triage efforts whatsoever, however, CPES could have bought enough time to have engaged in an out of court sale process that would have saved at least the outsized administrative expenses attendant to the Bankruptcy Proceeding, including, without limitation, the costs of the Liquidating Trustee and unnecessary attorneys' fees and expenses.

### The Bankruptcy Filings

133.    Instead, on April 24, 2023, the Board Defendants authorized CPES-AZ's and Novelles's voluntary petitions for relief under chapter 11 of the Bankruptcy Code (and then for CPES-CA at the urging of Mentor).

134.    Ultimately, Mentor purchased the assets of the Debtors out of bankruptcy for $9.35 million, a roughly thirty-two percent (32%) discount off their original purchase price for the equity.

135.    To date, the Debtors' bankruptcy estate has incurred in excess of $3 million in administrative expenses and other attorneys' fees and costs that would not have been incurred but for the Bankruptcy Proceeding.

136.    Were it not for the Board Defendants' failures, including, without limitation, their failures to engage appropriate professionals to assist them with evaluating their options for resolving their liquidity issues, formally market the equity/assets of CPES, and run a prudent and appropriate sale process, CPES could have achieved a much higher gross sales price and avoided the attendant multiple seven figure administrative (and other) expenses resulting from the Bankruptcy Proceeding.

137.    As a direct and proximate result of the Board Defendants' gross negligence and mismanagement of CPES, Plaintiffs and Class members have been irreparably damaged.

138.    At all times relevant, Monson and the Board Defendants acted directly and indirectly in the interest of CPES-AZ, the Plan Sponsor and Plan Administrator, in relation to

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

the CPES ESOP and the Plan Administrator's failure to provide annual participant account statements to the ESOP participants after the 2018 Plan year.

139.   Moreover, the Board Defendants, as members of the CPES Board of Directors responsible for monitoring the Trustee Defendants, failed to monitor the Trustee Defendants and, more egregiously, knowingly participated in the Trustee Defendants' breaches of ERISA fiduciary duty and conspired with them. Despite actual knowledge of the improper and incorrect 2018 year-end valuation, the Board Defendants and the Trustee Defendants have not taken any action to properly protect the CPES ESOP participants from the inflated valuation of the CPES stock held by the CPES ESOP. No action has been taken to correct the 2018 year-end valuation and the 2018 Form 5500 filing.

## CLASS ACTION ALLEGATIONS

140.   Plaintiffs bring certain of these claims for (i) plan-wide relief pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), (ii) for relief against any Defendant, whether acting in a fiduciary or a non-fiduciary capacity, under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), and (iii) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and on behalf of the following Class:[3]

> All participants in the CPES ESOP on or after December 31, 2018, who vested under the terms of the CPES ESOP, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the Plan; the directors of CPES or of any entity in which a Defendant has a controlling interest; and any legal representatives, successors, and assigns of any such excluded persons.

141.   ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought ... by a participant, beneficiary or fiduciary for appropriate relief under [ERISA Section 409, 29 U.S.C.] section 1109." In turn, ERISA Section 409(a), 29 U.S.C. § 1109(a), states that any fiduciary with respect to an ERISA plan who breaches "any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be*

---

[3] Plaintiff reserves the right to revise the class definition, and to propose other or additional classes or sub-classes in subsequent pleadings or a motion for class certification, after discovery in this action.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

*personally liable to make good to such plan any losses resulting from each such breach.*" (Emphasis supplied.)

142. The Supreme Court has explained that Plaintiffs' ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), claims are necessarily "brought in a representative capacity on behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985). In other words, the relief Plaintiffs seek pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), "inures to the benefit of the plan *as a whole*". *Id.* at 140.

143. *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which involved a defined contribution plan like the CPES ESOP, further demonstrated that "[ERISA] §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses caused by a fiduciary breach." *LaRue*, 552 U.S. at 261 (Thomas, J., concurring).

*A.   Numerosity*

144. The members of the Class are so numerous that joinder of all members is impracticable. According to the ESOP's 2018 Form 5500 filed with the DOL on October 10, 2019, as of December 31, 2018, there were 1,323 participants at the beginning of the 2018 Plan year and 1,177 participants with account balances within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), in the ESOP at the end of 2018.

145. According to the ESOP's 2019 Form 5500, belatedly filed with the DOL on April 23, 2021 – it was due to be filed no later than October 15, 2020 – as of December 31, 2019, there were 1,315 participants at the beginning of the 2019 Plan year and 1,248 participants with account balances within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), in the ESOP at the end of 2019.

146. As of the date hereof, as set forth on the DOL's eFast2 website, the Plan Administrator for the CPES ESOP has failed to file an IRS Form 5500 for the 2020 and 2021 Plan years, which such filing was due for plan year 2020 no later than October 15, 2021, and for plan year 2021 no later than October 17, 2022. Only on or after December 16, 2022, did the Plan Administrator belatedly provided the CPES ESOP participants with their ESOP account statements for Plan years 2019, 2020, and 2021, the first such statements since the

Plan Administrator provided them with their 2018 ESOP account statements at some point in 2019.

### B. Commonality

147. The issues of liability are common to all members of the Class and are capable of common answers, as those issues primarily focus on Defendants' acts or failure to act. Questions of law and fact common to the Class as a whole include the following:

a. Whether Defendants dealt with the assets of the CPES ESOP in their own interest or for their own account or received any consideration for their own account from any party dealing with the CPES ESOP in connection with the valuation of CPES-AZ as of December 31, 2018, the 2018 From 5500 and any distributions made thereunder, the Bankruptcy Proceeding, and any other or related transactions.

b. Whether Defendants, in discharging their responsibilities as ERISA and state law fiduciaries with respect to valuation of CPES as of December 31, 2018, the 2018 From 5500 and any distributions made thereunder, the Bankruptcy Proceeding, and any other or related transactions, acted solely in the best interests of the CPES ESOP participants, acted for the exclusive purpose of providing benefits to the CPES ESOP participants, and/or acted with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

c. Whether Defendants, through their failure to discharge their responsibilities as fiduciaries in connection with the valuation of CPES-AZ as of December 31, 2018, the 2018 From 5500 and any distributions made thereunder, the Bankruptcy Proceeding, and any other or related transactions, enabled other fiduciaries to breach their duties to the Plan or, having knowledge of a breach by such other fiduciary, failed to make reasonable efforts under the circumstances to remedy their breaches of fiduciary duties or those of others.

d. Whether Defendants used the Bankruptcy Proceeding to shield themselves from personal liability for their actions, including, without limitation, the

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

sheltering of officers and directors and fiduciaries, the wasting of the assets of CPES-AZ, Novelles, and CPES-CA, and the wasting of the retirement plans of the Plaintiffs and Class members.

   e.   Whether the Board Defendants, in discharging their responsibilities as ERISA and state law fiduciaries, by, *inter alia*, (i) failing to properly address CPES' mounting financial troubles; (ii) failing to undertake adequate due diligence replacement financing for CPES' Bank of the West line of credit; (iii) engaging in the sale/leaseback of CPES' real estate; (iv) failing to appropriately and properly act in a reasonably prudent manner in their efforts to sell CPES as a going concern; and (v) filing the Bankruptcy Proceeding, acted in a grossly negligent manner and acted solely in the best interests of the CPES ESOP participants, acted for the exclusive purpose of providing benefits to the CPES ESOP participants, and/or acted with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims..

   f.   The appropriate remedies as a result of Defendants' fiduciary breaches and prohibited transactions, and other violations of ERISA.

### C.   Typicality

148.   Plaintiffs' claims are typical of those of the Class because their claims arise from the same events, practices, and/or course of conduct. For example, Plaintiffs' claims, on behalf of the Class, allege that Defendants engaged in prohibited transactions or breaches of fiduciary duty in connection with the valuation of CPES as of December 31, 2018, the 2018 From 5500 and any distributions made thereunder, and any other or related transactions that adversely affected the ESOP and all of the ESOP participants. Similarly, Plaintiffs' claims, on behalf of the Class, allege that the Board Defendants violated ERISA by (i) failing to properly address CPES' mounting financial troubles; (ii) failing to undertake adequate due diligence replacement financing for CPES' Bank of the West line of credit; (iii) engaging in the sale/leaseback of CPES' real estate; (iv) failing to appropriately and properly act in a reasonably prudent manner in their efforts to sell CPES as a going concern; (v) failing to

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

consider and secure CARES Act relief; and (vi) filing the Bankruptcy Proceeding. Plaintiffs' claims also are typical of the claims of the Class, because they generally seek recovery and relief on behalf of the Plan.

### D.    Adequacy

149.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

150.    Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

151.    Defendants do not have any unique defenses that would interfere with Plaintiffs' representation of the Class.

152.    Plaintiffs have retained legal counsel competent and experienced in complex class actions, ERISA, and/or employee benefits litigation and with particular experience and expertise in ESOP litigation of this kind.

### E.    Fed. R. Civ. P. 23(b)(1)(A)

153.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the CPES ESOP as a whole, not on an individualized-account CPES ESOP participant basis. As a result, the prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

### F.    Fed. R. Civ. P. 23(b)(1)(B)

154.    Class certification also is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their ERISA fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the CPES ESOP even if they are not parties to this litigation and would substantially impair or

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

### G.      Fed. R. Civ. P. 23(b)(2)

155.    Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class as a whole. This action challenges whether Defendants acted consistently with their ERISA and state law fiduciary duties and thereby violated ERISA as to the ESOP as a whole, not on an individualized-account CPES ESOP participant basis. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' violations. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or as a necessary consequence of that relief.

### H.      Fed. R. Civ. P. 23(b)(3)

156.    The requirements of Fed. R. Civ. P. 23(b)(3) also are satisfied. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all ESOP participants and therefore to all members of the Class. Plaintiffs and all Class members have been harmed by Defendants' ERISA fiduciary breaches. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

157.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims herein are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings, each of which could seek recovery for the entire Plan. The amounts recoverable by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' ERISA fiduciary duties with regard to the ESOP and otherwise.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

158.    The following factors set forth in Rule 23(b)(3) also favor certification of this case as a class action:

a.    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.    No other litigation concerning this controversy has been filed by any other member(s) of the Class.

c.    There are no anticipated difficulties in managing this case as a class action.

d.    This District is the most desirable location for concentrating the litigation for reasons that include, but are not limited to the following: (i) CPES-AZ was headquartered in this District; (ii) the CPES ESOP was administered in this District; (iii) certain non-party witnesses are located in this District; and (iv) most the Defendants and Class members reside, work, and/or transact business in this District.

159.    ERISA allows an action to be brought on behalf of a Class of participants in and beneficiaries of the CPES ESOP to restore losses to the CPES ESOP, disgorge any profits, and to obtain other remedies arising out of the current and former fiduciaries' breaches of fiduciary duties and other violations of ERISA. Plaintiffs seek to enforce their rights and those of other participants in the Plan under ERISA, to recover the losses incurred by the Plan as a result of the breaches of fiduciary duty or other violations of ERISA, and to ensure that the Plan and its assets have been properly administered. Among the relief sought for these breaches and violations, Plaintiffs request that the breaching fiduciaries be ordered to pay the losses to the Plan, to disgorge any profits, that the Court order other remedial and equitable relief, and that any monies recovered for the Plan be allocated to the accounts of the Class Participants.

## CAUSES OF ACTION

### COUNT I
**Breaches of Fiduciary Duty Under ERISA Sections 404(a)(1)(A) and (B),
29 U.S.C. §§ 1104(a)(1)(A) and (B) – Inflated 2018 Year-End Valuation
and Associated Distributions Made in Reliance Thereon
(All Defendants)**

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

160.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 159 as if the same has been set forth herein.

161.   ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries of a plan, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

162.   The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

163.   The duties of loyalty under ERISA Section 404(a)(1)(A) and prudence under ERISA Section 404(a)(1)(B) required the Trustee Defendants and to the extent that the Board Defendants or others directed the Trustee Defendants in connection with the 2018 year-end appraisal, the Board Defendants and others to undertake an appropriate investigation of the fair market value of CPES stock in the 2018 year-end valuation in order to fulfill their fiduciary duties. Among other things, Trustee Defendants and the Board Defendants were required to conduct a thorough and independent review of any "independent appraisal", to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of the 2018 year-end valuation; to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions.

164.   The Trustee Defendants and the Board Defendants were required to undertake an appropriate and independent investigation of the fair market value of CPES as of December 31, 2018, in order to fulfill their respective fiduciary duties, and an appropriate investigation would have revealed that the valuation used for December 31, 2018, did not reflect the fair market value of the CPES stock held by the CPES ESOP.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

165.    ERISA requires that the fair market value of the CPES ESOP's asset be determined in good faith by the trustee or named fiduciary. ERISA further requires that the trustee or named fiduciary conducted a prudent investigation to determine the fair market value of the asset.

166.    The Trustee Defendants, and the Board Defendants knew that the change in methodologies and errors and mistakes in the 2018 year-end valuation turned an estimated forty-percent reduction in fair market value to an estimated sixty-three percent increase. These fiduciaries knew that the 2018 year-end valuation did not reflect the fair market value of the CPES stock, was not in the best interests of the Plan participants, and that distributions made on the improper valuation would cause losses to the ESOP.

167.    Defendant Tarajano knew or reasonably should have known that, to the extent he was being directed by the Board Defendants or anyone else, such directions violated ERISA and that he should not have followed such directions. Nonetheless, he did.

168.    Following the inflated valuation, the CPES ESOP made benefit payments based on that valuation. Payments made on an inflated valuation will necessarily be inflated by a factor equal to the over valuation. By Defendant Monson's testimony, that over-valuation could be as high as 63%. Plaintiffs and the ESOP participants suffered losses to the value of their shares of CPES capital stock based on these overpayments.

169.    By failing to make appropriate and independent investigation of the fair market value of CPES as of December 31, 2018, the Trustee Defendants and the Board Defendants breached their fiduciary duties under ERISA Sections 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

170.    Furthermore, the Board Defendants were required to appoint an ESOP trustee or trustees who would discharge his or her duties to the Plan with the loyalty, care, skill, prudence, and diligence required under ERISA. Instead they appointed the Trustee Defendants, who violated ERISA in approving the December 31, 2018 valuation as described herein.

171.    In addition, under ERISA Sections 404(a)(1)(A) and (B), a fiduciary with the authority to appoint and/or remove other fiduciaries has an obligation to undertake an

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the fiduciary who has been appointed remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

172. According to Section 16 of the CPES ESOP Plan Document, CPES "has the sole authority to appoint and remove the Trustee". Pursuant to that authority, Defendant Monson and the Board Defendants had a duty to monitor the CPES ESOP Trustees' conduct and to take appropriate action if the Trustee(s) and ESOP Committee were not adequately protecting the interests of CPES ESOP participants, including removing the CPES ESOP Trustees and correcting any breaches.

173. Defendant Monson, the Board Defendants, and the Trustee Defendants knew or in the exercise of reasonable diligence should have known that the Trustee Defendants breached their fiduciary duties in that the 2018 year-end valuation did not reflect fair market value for the stock of CPES and took no steps to protect the CPES ESOP participants or to otherwise remedy the violations.

174. Indeed, Defendant Monson, the Board Defendants, and the Trustee Defendants have taken no steps to protect the CPES ESOP participants from these breaches, including, but not limited to, stopping or delaying the 2018 year-end valuation, removing the CPES ESOP Trustees and/or remedying these breaches.

175. By failing to properly monitor and/or take appropriate action against the Trustee Defendants, Defendant Monson and the Board Defendants have breached their fiduciary duties under ERISA Sections 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B).

176. ERISA Section 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be *personally liable to make good* to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary. (Emphasis added.)

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

177. ERISA Section 502(a), 29 U.S.C. § 1132(a), permits a plan participant to bring a suit for relief under ERISA Section 409 and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

178. The Trustee Defendants, Defendant Monson and the Board Defendants have caused losses to the Plan by their breaches of fiduciary duty in amounts to be proved specifically at trial.

179. An appropriate investigation by the Trustee Defendants and the Board Defendants would have revealed that the 2018 year-end valuation did not reflect the fair market value of CPES-AZ, was inflated and contained mistakes, and that the 2018 year-end valuation was not in the best interests of the CPES ESOP participants.

180. An appropriate investigation by the Trustee Defendants and the Board Defendants would have revealed that the 2018 year-end valuation was conducted using an asset-based methodology that deviated from the enterprise basis required under Section 2 (Definition of Fair Market Value) of the CPES ESOP Plan Document.

181. By causing CPES-AZ and the CPES ESOP to distribute monies to certain CPES ESOP Plan participants in improper and unjustifiable reliance upon the inflated 2018 year-end valuation, the Trustee Defendants and the Board Defendants violated the terms of the ESOP Plan Document and the ESOP Trust Agreement, breached their fiduciary duties under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the CPES ESOP.

182. To the extent that the Trustee Defendants acted at the direction of the Board Defendants in accepting the improperly inflated 2018 year-end valuation and/or in distributing monies to certain CPES ESOP Plan participants in improper and unjustifiable reliance upon the inflated 2018 year-end valuation, the Board Defendants breached their fiduciary duties under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the CPES ESOP.

183. To the extent that the Trustee Defendants acted at the direction of the Board Defendants or anyone else, the Trustee Defendants still had an obligation under ERISA

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

Section 403(a)(1), 29 U.S.C. § 1103(a)(2), to refuse to follow such direction that either violated the terms of the CPES ESOP Plan Document or that violated ERISA.

184.   ERISA Section 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

185.   Following the inflated valuation, the CPES ESOP made benefit payments based on that valuation. Payments made on an inflated valuation will necessarily be inflated by a factor equal to the over-valuation. By Defendant Monson's sworn testimony, that over-valuation could be as high as 63%. Plaintiffs and the Class members suffered losses to the value of their shares based on these overpayments.

186.   As a result, the Trustee Defendants and the Board Defendants breached their duties under ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

187.   The Trustee Defendants and the Board Defendants have caused losses to the Plan by their breaches of fiduciary duty in amounts to be proved specifically at trial.

**<u>COUNT II</u>**
**Breaches of Fiduciary Duty Under ERISA Sections 404(a)(1)(A), (B) and (D),**
**29 U.S.C. §§ 1104(a)(1)(A), (B) and (D), for Failure to Remedy or**
**Correct the 2018 Year-End Valuation**
**(All Defendants)**

188.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 187 as if the same has been set forth herein.

189.   ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries of the plan, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan to the extent that such documents and instruments are consistent with ERISA.

190.   Section 16(c) of the CPES ESOP Plan Document provides that the CPES ESOP Administrative Committee, and under circumstances applicable here, the Board Defendants, may "engag[e] any administrative, legal, accounting, clerical or other services that it may deem appropriate".

191.   Trustee Defendants also had the authority to engage any legal services they may deem appropriate to assist in the performance of their duties. For example, Defendant Tarajano's "Trustee Services Agreement" with CPES permits him authority to retain and rely upon the advice of independent legal counsel. [Tarajano Trustee Services Agreement, at Section 4.]

192.   Section C(8) of the CPES ESOP Trust Agreement provides the Trustee Defendants with the authority to "sue, defend, compromise, arbitrate or settle any suit or legal proceeding or any claim due it or on which it may be liable". As such, the Trustee Defendants had the authority and obligation to institute a lawsuit against any fiduciary, including themselves, who breached his or her ERISA fiduciary duties with respect to the 2018 year-end valuation and were required to remedy any ESOP losses arising from such valuation, including as necessary by employing counsel to bring a legal action to correct such ESOP losses from those personal responsible for such ESOP losses (including themselves). By failing to institute such a lawsuit, the Trustee Defendants breached their ERISA fiduciary duties.

193.   Sections 16(c)(9) and (10) of the CPES ESOP Plan Document grant to the CPES ESOP Administrative Committee, and under the circumstances here, to the Board Defendants, the power to "(9) review[] the performance of the Trustee with respect to the Trustee's administrative duties, responsibilities and obligations under the Plan and Trust Agreement; (10) select[] an independent appraiser and determining the Fair Market Value of CPES Stock as of such dates as it determines to be necessary or appropriate."

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

194. As a result of such powers, the CPES ESOP Administrative Committee, and under the circumstances here, the Board Defendants, had the power, authority and obligation to do one or more of the following: (1) inform the Trustee Defendants that the 2018 year-end valuation and distributions made in reliance thereon were inappropriate and impermissible and would need to be corrected; (2) inform the Board of Directors that the 2018 year-end valuation and distributions made in reliance thereon had likely violated ERISA and the terms of the Plan and recommend that the breaching fiduciaries be removed and replaced with fiduciaries who would correct the 2018 year-end valuation and associated distributions; and/or (3) take steps to correct the defects therein, including if necessary by instituting a lawsuit against any fiduciary, including themselves, who breached his or her duties in the 2018 year-end valuation and associated distributions. By failing to take such steps that would correct the defects in the 2018 year-end valuation and associated distributions, the Board Defendants breached their fiduciary duties.

195. Section 13.05 of the CPES ESOP Plan Document also provides that the "[s]hares of CPES Stock in the Trust shall be voted in the manner determined by the Trustee". As a result of this authority, the Trustee Defendants had the power to vote the Trust shares of CPES stock in a manner that would have removed the existing Board of Directors, appoint independent Directors who would act appropriately to remove and replace any person who had breached their fiduciary duties (i.e., all of them), and replace them with members of the Committee who would appropriately act to remedy the 2018 year-end valuation and associated distributions. By failing to take such action, the Trustee Defendants breached their fiduciary duties.

196. By failing to correct the 2018 year-end valuation and associated distributions, the Trustee Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), and caused losses to the CPES ESOP and the accounts of the Plaintiffs and Class Members.

197. By failing to correct the 2018 year-end valuation and associated distributions, the Board Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A), (B) and

(D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), and caused losses to the CPES ESOP and the accounts of the Plaintiffs and Class Members.

## COUNT III
### Breaches of ERISA Fiduciary Duty
### (Board Defendants)

198. Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 though 197 as if the same has been set forth herein.

199. The Board Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed to the CPES ESOP and the CPES ESOP Participants fiduciary duties under ERISA. The Ninth Circuit has recognized that the general rule that corporate assets are not plan assets where the plan is an ESOP ( 29 C.F.R. § 2510.3-101(h)(3) is inapplicable in the context of a 100% ESOP owned company taking actions towards liquidation when the ESOP will be the sole beneficiary of the liquidation proceeds. *Johnson v. Couturier*, 572 F.3d 1067,1081 (9th Cir. 2009). Accordingly, the ERISA fiduciary standards are applicable to the actions of Board Defendants, and under applicable state corporate law.

200. These ERISA fiduciary duties required the Board Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of the CPES ESOP and the Debtors.

201. Given that the Debtors were 100% owned by the CPES ESOP, these ERISA fiduciary duties also required the Board Defendants to seek to reasonably maximize corporate value, and to preserve maximum corporate value for distribution to the CPES ESOP.

202. The Board Defendants were ERISA fiduciaries with respect to the CPES ESOP and the CPES ESOP Participants because they exercised authority and control over the businesses of the Debtors that were assets of the CPES ESOP because all of the recovery from the intended plan of liquidation of such businesses is recoverable by the ESOP. The Board Defendants breached their ERISA fiduciary duties to the CPES ESOP and the CPES ESOP Participants by, inter alia:

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

a.    Failing to undertake reasonable and prudent efforts to address liquidity concerns resulting from the termination of the Line of Credit, including entering into the Sale/Leaseback Transactions without appropriate professional guidance;

b.    Failing to undertake reasonable and prudent efforts in connection with the sale of CPES prior to the Petition Date, including running an orderly sale process and valuing the assets and equity of the enterprise;

c.    Failing to undertake reasonable and prudent efforts to secure CARES Act relief for the benefit of CPES;

d.    Failing to undertake reasonable and prudent efforts and impose sufficient controls to maximize revenue and minimize expenses in light of the Pandemic; and

e.    Failing to evaluate and consider alternatives to the Bankruptcy Process that could have reduced the exorbitant administrative expenses associated the Bankruptcy Process.

203.    Each of the foregoing grossly negligent failures is highlighted by equally grossly negligent and contemporaneous failures to take the customary and prudent step of retaining and consulting with appropriate professionals to assist the Debtors in addressing each of the non-ordinary course business transactions.

204.    The failure of the Board Defendants to discharge their ERISA fiduciary duties inflicted serious harm on CPES, the CPES ESOP and the CPES ESOP Participants, and was the primary factor causing CPES to file for bankruptcy.

205.    As a result, the Board Defendants' breaches of their ERISA fiduciary duties and have damaged the Plaintiff and Class members in an amount to be determined at trial, including, but not limited to:

a.    The reduction in gross sale price achieved through the bankruptcy asset sale to Mentor versus the prepetition equity transaction with the same buyer totaling at least $4.3 million;

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

b.      The rejection damages claimed by CapGrow resulting from the leases negotiated by the D&O Defendants in the Sale/Leaseback Transactions totaling $585,817.70;

c.      The CARES Act relief that the D&O Defendants failed to secure totaling at least $2 million; and

d.      The administrative expenses, including the attorneys' fees and expenses attributable to the Liquidating Trustee, incurred by the bankruptcy estate totaling in excess of $3 million.

## COUNT IV
### Breaches of Fiduciary Duty to Disclose and Inform Under
### ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)
### (Against the Board Defendants)

206.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 204 as if the same has been set forth herein.

207.    An ERISA fiduciary's duty of loyalty and prudence under ERISA Section 404(a)(1)(A) and (B) includes a duty to disclose and inform. Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

208.    Defendant Monson and the Board Defendants have failed to correct the misinformation and misrepresentations described herein, including the failure to correct the misinformation arising from the 2018 year-end valuation.

209.    By failing to update the CPES ESOP participants with correct information, Defendant Monson and the Board Defendants have violated ERISA Section 102, 29 U.S.C. § 1022, ERISA Section 104(b)(1), 29 U.S.C. § 1024(b)(1), and ERISA Sections 404(a)(1)(A) & (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B).

210.    Defendant Monson and the Board Defendants have caused losses to the CPES ESOP and the CPES ESOP Participants by their breaches of ERISA fiduciary duty in amounts to be proved specifically at trial.

**COUNT V**
**Breach of Fiduciary Duty to Act Prudently and in**
**Accordance with the Plan Documents**
**(All Defendants)**

211.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 210 as if the same has been set forth herein.

212.    ERISA Section 404(a)(l), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries;

and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments .....

211.    The Defendants owe statutory fiduciary duties under ERISA to the ESOP.

212.    The Defendants have a duty to act prudently with respect to their ERISA duties.

213.    The Defendants did not have clear knowledge and understanding of their fiduciary duties under ERISA.

214.    The Defendants failed to properly delegate duties and responsibilities between the ESOP Trustees and the ESOP Committee.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

215. Additionally, there were disagreements between the roles of the various fiduciaries in general.

216. There was at all times relevant hereto a misunderstanding as to the specific delegation of the specific duties among the various parties and the administration of the CPES ESOP was required to be conducted pursuant to the Plan Documents.

217. Furthermore, the fact that the ESOP Committee was essentially illusory demonstrates that the Defendants were not truly acting prudently in performing their responsibilities to the ESOP Participants.

218. As a result of these actions, or inactions, the Defendants caused the CPES ESOP and the CPES ESOP Participants to suffer damages.

## COUNT VI
### Co-Fiduciary Liability Under ERISA Sections 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3)
### (Against All Defendants)

219. Plaintiffs hereby reincorporate and reallege the allegations contained in paragraphs 1 through 218 as if the same has been set forth herein.

220. ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach …".

221. ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach …".

222. ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy such breach".

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

223.    As set forth herein, as CPES ESOP fiduciaries, all of the Defendants (a) participated in the others' breach of duty, (b) enabled the others to breach their duties to the CPES ESOP related to various transactions described in this Complaint, (c) knew or should have known of the others' breaches of fiduciary duty and failed to take action regarding the various transactions described in this Complaint, and (d) failed to make reasonable efforts under the circumstances to remedy those breaches of duty. ERISA Sections 405(a)(1)-(3) and 502(a)(2) & (5), 29 U.S.C. §§ 1105(a)(1)-(3), 1132(a)(2) & (5).

224.    All of the Defendants knew or should have reasonably known that the December 31, 2018, year-end valuation was improperly inflated and that the distributions made thereunder also were inflated. The Board Defendants knew that the other Board Defendants were not taking reasonable steps to monitor the Trustee Defendants and that they were not ensuring that Trustee Defendants acted solely in the interests of the CPES ESOP's participants with respect to the 2018 year-end valuation and the associated distributions.

225.    Accordingly, all Defendants also are liable as co-fiduciaries for the losses caused by any fiduciary.

## COUNT VII
### Knowing Participation in Fiduciary Breaches
### Under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)
### (Against All Defendants)

226.    Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 225 as if the same has been set forth herein.

227.    ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach …".

228.    ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach …".

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

229. ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy such breach".

230. Defendants knowingly participated in the fiduciary breaches of each other Defendant as alleged herein because they had both actual and constructive knowledge of the facts that led to such other's fiduciary breaches in this matter.

231. As a result of the foregoing violations of ERISA, Defendants each caused a loss to the CPES ESOP for which each is personally liable.

## COUNT VIII
**Breach of Fiduciary Duty Under ERISA Sections 404(a)(1)(A), (B), and (D),
29 U.S.C. § 1104(a)(1)(A), (B), and (D) for
Failure to Monitor the Trustee Defendants
(Against the Board Defendants)**

232. Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 231 as if the same has been set forth herein.

233. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

234. Under ERISA, a fiduciary charged with the authority to appoint and remove other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries has an ongoing duty to monitor the performance of those persons whom the fiduciary is empowered to remove.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

235.   A monitoring fiduciary must, at reasonable intervals, ensure that the fiduciary that it has appointed is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the plan.

236.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the management of the plan assets.

237.   A monitoring fiduciary must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their obligations.

238.   The Board Defendants appointed the Trustee Defendants.

239.   The Board Defendants were fiduciaries of the CPES ESOP under ERISA Section 3(21(A), 29 U.S.C. § 1002(21)(A), because pursuant to Section 2 (Definition of Trustee), the CPES ESOP Plan Document, the Board Defendants were responsible for appointing the Trustee Defendants.

240.   Had the Board Defendants appropriately monitored the Trustee Defendants, they would have determined that the Trustee Defendants had breached their fiduciary duties because (i) the Trustee Defendants' process of establishing the fair market value of CPES-AZ in the 2018 year-end valuation was flawed; (ii) the Trustee Defendants followed an improper direction that the Trustee Defendants should not have followed; and/or (iii) the Trustee Defendants failed to take any corrective action.

241.   By failing to properly monitor the Trustee Defendants, permitting the Trustee Defendants to proceed with the 2018 year-end valuation and associated distributions, and failing to take sufficient steps or corrective action to protect CPES ESOP participants, the Board Defendants breached their fiduciary duties under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

**COUNT IX**
**ERISA Section 410(a), 29 U.S.C. § 1110(a) –**
**Improper Indemnification**
**(Against All Defendants)**

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

242.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 241 as if the same has been set forth herein.

243.   There are a number of documents that purport to indemnify Defendants that violate ERISA's prohibition on fiduciary indemnification.:

244.   Such indemnification provisions, "which relieve fiduciaries from responsibility or liability for any responsibility, obligation, or duty … shall be void as against public policy" under ERISA Section 410, 29 U.S.C. § 1110.

245.   As such, none of the Defendants herein are entitled to indemnification for their defense of this case, for the ESOP's losses, or for the damages and/or attorneys' fees and costs to be awarded against them.

### COUNT X
### ERISA Section 502(c), 29 U.S.C. 1132(c)(1) –
### Failure to Provide Participant Account Statements
### (Against the Board Defendants)

246.   Plaintiffs hereby reallege and incorporate the allegations contained in paragraphs 1 through 245 as if the same has been set forth herein.

247.   ERISA § 105(a)(1)(A)(ii), 29 U.S.C. § 1025(a)(1)(A)(ii), requires the CPES ESOP Plan Administrator to "furnish a pension benefit statement– … at least once a calendar year to a participant or beneficiary who has his or her own account under the plan but does not have the right to direct the investment of assets in that account".

248.   The Ninth Circuit has also recognized that a fiduciary's duty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), to disclose is not limited to those specified in the statute, but extends to additional disclosures to the extent that they relate to the provision of benefits or the defrayment of expenses. *See, e.g.*, *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1051 (9th Cir. 2020); *Washington v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 504 F.3d 818, 823-25 (9th Cir. 2007) (ERISA imposes "an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information."); *Hughes Salaried Retirees Action Committee v.*

*Administrator of the Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 690 (9th Cir. 1995) (*en banc*).

249.   The Board Defendants, acting as CPES ESOP Plan Administrator, had the obligation on behalf of CPES to timely provide Plaintiffs and each of the ESOP participants with their participant account statements for plan years 2019, 2020, and 2021.

250.   ERISA Section 502(c)(1)(A), 29 U.S.C. § 1132(c)(1)(A), provides for penalties for a plan administrator's refusal to provide required information. Under that section of ERISA:

> "(1) Any administrator (A) who fails to meet the requirements of … section 1025(a) of this title with respect to a participant or beneficiary, … may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, … shall be treated as a separate violation."

251.   While ERISA Section 502(c), 29 U.S.C. § 1132(c), provides a penalty of up to $100 per day, that amount was increased to $110 per day by federal regulation. 29 C.F.R. § 2575.502c-1.

252.   Plaintiffs and the CPES ESOP participants did not receive their participant account statements for ESOP plan years 2019, 2020, and 2021 in a timely manner. As of December 15, 2022, the last participant account statement they received was for ESOP plan year 2018, namely their respective account balances as of December 31, 2018, which they received sometime in 2019. On or after December 16, 2022, the ESOP participants began belatedly receiving their respective participant account statements for ESOP plan years 2019, 2020, and 2021.

253.   The CPES ESOP Plan Administrator, namely, the Board Defendants acting on behalf of CPES-AZ, failed and refused to provide such participant account statements earlier.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

254. There are believed to be in excess of 1,300 current and former CPES-AZ employees who are participants or their beneficiaries in the CPES ESOP who did not timely receive participant account statements.

255. Plaintiffs and each CPES ESOP participant are, therefore, each entitled to damages in the amount of $110 per day for the Board Defendants' failure to timely provide their CPES ESOP participant account statements for 2019, 2020, and 2021, to be calculated from approximately October 15, 2020, October 15, 2021, and October 15, 2022, respectively, to the present.

### NOTICE TO THE SECRETARY OF LABOR AND THE SECRETARY OF THE TREASURY

256. In accordance with ERISA Section 502(h), 29 U.S.C. § 1132(h), Plaintiffs will serve by certified mail a copy of this First Amended Class Action Complaint for Violations of ERISA upon the Secretary of Labor and Secretary of the Treasury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants and for the following relief:

A. Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, for breach of their fiduciary duties under ERISA to the Plan and the class members;

B. Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, in an amount to personally make good to the Plan and/or to any successor trust(s) the losses resulting from their breaches of ERISA;

C. Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman, and Alberto Tarajano, and any DOE Defendants, jointly and severally, to provide other appropriate equitable relief to the Plan and its participants and beneficiaries;

D. Judgment against Defendants David Johnson, Mark G. Monson, Douglas Zimmerman and any DOE Defendants (in their capacity as the Plan Administrator of the CPES

FIRST AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF ERISA

ESOP), jointly and severally, in the amount of $110 per day for each of the Plaintiffs and class members, for a period time to be determined at trial, for failing to timely provide the CPES ESOP participants and beneficiaries with their CPES ESOP account statements for 2019 and 2020;

E.      Judgment declaring the proceeds of any recovery for the Plan is to be allocated to the accounts of the Plaintiffs and Class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

F.      Enjoin, strike, void, and declare invalid the portions of the CPES ESOP Plan Documents, CPES ESOP Trust Agreement, and any other agreement which purport to indemnify Defendants at the expense of the CPES ESOP or the debtors (other than valid insurance policies which do not result in additional expenses to the CPES ESOP), and restore all losses to the CPES ESOP which have resulted from such provisions, including, without limitation, immediate preliminary and permanent injunctive relief prohibiting the indemnification of Defendants and the advancement of any attorneys' fees and costs;

G.      Order Defendant Alberto J. Tarajano to disgorge any fees and costs for attorneys' fees he received and/or for which he or his attorneys were reimbursed in conjunction with the matters herein, and to enter an Order declaring that any indemnification of Defendant Tarajano and/or any other Defendant is improper and impermissible;

H.      Order that Defendants and each of them provide other appropriate equitable relief to the Plan;

I.      Award Plaintiffs' reasonable attorneys' fees and costs of suit incurred under ERISA Section 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

J.      Order Defendants to pay prejudgment and post-judgment interest;

K.      Certify this action as a class action under Fed. R. Civ. P. 23;

L.      Appoint Plaintiffs Robert Bennetti, Linda Mariano, and Linki Peddy, as class representatives;

M.      Appoint Plaintiffs' counsel as Class Counsel; and

N.    Award such other and further relief as this Court deems equitable and just.

Dated:  July 26, 2023                    Respectfully submitted,

                                         */s/ Gregory Stoltz*
                                         Gregory Stoltz (027519)
                                         G Stoltz Law, LLC
                                         100 N. Stone Ave., Ste 702
                                         Tucson, Arizona 85701
                                         (520) 428-4734
                                         greg@gstoltzlaw.com

                                         *Attorneys for Plaintiffs Robert Bennetti, Linda*
                                         *Mariano, and Linki Peddy and the proposed Class*
                                         *Plaintiffs*

FIRST AMENDED CLASS ACTION
                                         COMPLAINT FOR VIOLATIONS OF ERISA

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2023, I caused a copy of the foregoing First Amended Complaint for ERISA Violations to be served via this Court's ECF system (and via e-mail) upon all parties that have entered their appearance herein via their counsel of record and to those parties that have not yet entered their appearance via first class mail:

*Attorneys for Defendant Mark G. Monson*:

Gary A. Gotto, Bar No. 007401
KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel.: 602.248.0088
ggotto@kellerrohrback.com

Erin M. Riley (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel.: 206.623.1900
eriley@kellerrohrback.com

*Attorneys for Defendants David Johnson and Douglas Zimmerman*:

Elise D. Klein (*pro hac vice*)
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel.: 213.680.5153
elise.klein@lewisbrisbois.com

*Attorneys for Alberto J. Tarajano*:

Lars Calvin Golumbic (*pro hac vice*)
Ross Philip McSweeney (*pro hac vice*)
GROOM LAW GROUP CHARTERED
1701 Pennsylvania Ave. NW, Suite 1200
Washington, DC 20006-5811
Tel.: 202.306.3013
lcg@groom.com
rmcsweeney@groom.com

*Attorneys for Nominal Defendant CPES ESOP*:

Chelsea Mikula
TUCKER ELLIS, LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
(216) 592-5000
chelsea.mikula@tuckerellis.com

/s/ *Gregory Stoltz*
Gregory Stoltz

# EXHIBIT "A"

Exhibit B

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### NORTHERN DIVISION

| | |
|---|---|
| In re: | ) Lead Case No. 9:20-bk-10554-DS |
| | ) Jointly Administered With: |
| CPES-AZ Liquidating, Inc., et al., | ) Case No. 9:20-bk-10553-DS |
|    EIN: 86-0804057 | ) Case No. 9:20-bk-10994-DS |
| NDS Liquidating, Inc. | ) |
|    EIN: 27-5174435 | ) Chapter 11 Cases |
| CPESCA Liquidating, Inc. | ) |
|    EIN: 27-2315212 | ) **ADVERSARY COMPLAINT** |
|          Debtors. | ) |
| | ) |
| OXFORD RESTRUCTURING | ) Adversary Case No. |
| ADVISORS, LLC, AS | ) |
| LIQUIDATING TRUSTEE OF | ) |
| THE CPES LIQUIDATING TRUST, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MARK MONSON, DAVID | ) |
| JOHNSON, DOUGLAS | ) |
| ZIMMERMAN, MICHELE | ) |
| FERRALL, TIKI THOMPSON, | ) |
| MARY LYNN GREENHOW, | ) |
| CATHY HUNT, CHARLES FOUST, JR., | ) |
| CURT WHEELER, NANCY GROVE | ) |
| AND ALBERTO TARAJANO, | ) |
| | ) |
|         Defendants. | ) |
| | ) |

Plaintiff, Oxford Restructuring Advisors, LLC, as Liquidating Trustee of the CPES Liquidating Trust (the "Plaintiff" or "Liquidating Trustee"), by and through its undersigned counsel, brings this adversary complaint ("Complaint") against the Defendants Mark Monson, David Johnson, Douglas Zimmerman, Michele Ferrall, Tiki Thompson, Mary Lynn Greenhow,

1

Exhibit B

Cathy Hunt, Charles Foust, Jr., Curt Wheeler, Nancy Grove and Alberto Tarajano and states as follows:

## NATURE OF THE CASE

1.      The defendants are former directors, officers and/or employees of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and collectively, the "Debtors") and fiduciaries of the CPES Employee Stock Ownership Trust in accordance with the CPES Employee Stock Ownership Plan (the "ESOP Plan").

2.      The Debtors were once profitable behavior health services companies; however, as a direct result of the defendants' gross mismanagement described below – including their refusal to seek advice and assistance from outside professionals in connection with at least three major non-ordinary course transactions including the valuation and sale of the enterprise – the Debtors suffered irreparable financial harm that resulted in and included chapter 11 bankruptcy filings.

3.      The Liquidating Trustee seeks an award of monetary damages for the defendants' conduct in failing to properly perform their fiduciary duties.

## JURISDICTION

4.      The Court has jurisdiction pursuant to 11 U.S.C. §§ 105, 541, 544, 547, 548, 549, 550 and 551, Bankruptcy Rule 7001, 28 U.S.C. § 1334 and pendent jurisdiction with respect to state law causes of action. This adversary proceeding arises under Title 11 of the United States Code and arises in or is related to Chapter 11 Bankruptcy Case Nos. 9:20-bk-10554-DS, 9:20-bk-10553-DS and 9:20-bk-10994-DS (the "Main Case") pending before this Court.

2

Exhibit B

5.      This matter is a core proceeding pursuant to 11 U.S.C. §§ 157(b)(2)(A), (E), (F), (H) and (O).

6.      Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

**THE PARTIES**

7.      On April 24, 2020 (the "Phase I Petition Date"), CPES-AZ and Novelles filed voluntary cases under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

8.      On August 11, 2020 (the "Phase II Petition Date", and together with the Phase I Petition Date, the "Petition Date"), CPES-CA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

9.      The Liquidating Trustee was appointed pursuant to the Debtors' *First Amended Joint Chapter 11 Plan of Liquidation* ("Plan"), as modified (Main Case Docket No. 646) and confirmed by Order of the Bankruptcy Court dated May 10, 2021 (the "Confirmation Order") (Main Case Docket No. 836).

10.     The Liquidating Trustee is bound by the Liquidating Trust Agreement, which was approved by the Confirmation Order.

11.     Under the Plan and Confirmation Order, the Debtors' assets, including Litigation Claims and Causes of Action.

12.     Section 5.2 of the Plan provides that all rights to commence, prosecute, or settle any and all Causes of Action (excluding Direct ESOP Claims) whether arising prepetition or post-petition vests in the Liquidating Trust and the Liquidating Trustee may enforce all rights to commence, prosecute, or settle all Causes of Action.

3

Exhibit B

13.    Defendant Mark Monson ("Monson") is an individual believed to be residing in Tucson, Arizona and is the former President, Chief Executive Officer, member of the ESOP Plan Committee and an insider of the Debtors.

14.    Defendant David Johnson ("Johnson") is an individual believed to be residing in Tucson, Arizona and is the former Chairman of the Board of Directors (the "Board") and an insider of the Debtors.

15.    Defendant Douglas Zimmerman ("Zimmerman") is an individual believed to be residing in Tucson, Arizona and is the former Chief Financial Officer and an insider of the Debtors.

16.    Defendant Michele Ferrall ("Ferrall") is an individual believed to be residing in Santa Maria, California and is a former Director, Regional Vice President of Operations in California and an insider of the Debtors.

17.    Defendant Tiki Thompson ("Thompson") is an individual believed to be residing in Fontana, California and is a former Director, Associate Vice President of Operations in California and an insider of the Debtors.

18.    Defendant Mary Lynn Greenhow ("Greenhow") is an individual believed to be residing in Tucson, Arizona and a former internal ESOP Plan Trustee, Corporate Secretary, Vice President of Administration and an insider of the Debtors.

19.    Defendant Cathy Hunt ("Hunt") is an individual believed to be residing in Tucson, Arizona and is a former Director and an insider of the Debtors.

20.    Defendant Ron Barber ("Barber" and together with Hunt, Greenhow, Thompson, Ferral, Zimmerman, Monson and Johnson, collectively the "D&O Defendants") is an individual believed to be residing in Tucson, Arizona and is a former Director and an insider of the Debtors.

4

Exhibit B

21.    Defendant Charles Foust, Jr. ("Foust") is an individual believed to be residing in Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

22.    Defendant Curt Wheeler ("Wheeler") is an individual believed to be residing in Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

23.    Defendant Nancy Grove ("Grove" and together with Foust and Wheeler, collectively the "ESOP Committee") is an individual believed to be residing Tucson, Arizona and is a former member of the ESOP Plan Committee and an insider of the Debtors.

24.    Defendant Alberto Tarajano ("Tarajano" and together with the D&O Defendants and the ESOP Committee, collectively the "ERISA Fiduciary Defendants") is an individual believed to be residing in Key Biscayne, Florida and is the former ESOP Plan Trustee.

## GENERAL ALLEGATIONS

### *The Prepetition Debtors' Affairs*

25.    At all relevant times, Novelles and CPES-CA were wholly owned subsidiaries of CPES-AZ.

26.    The Debtors' prepetition business activities included providing outpatient mental health services, intensive therapy programs, employee assistance program services, individual and group counseling, addiction recovery programs, child and family services, foster care, training vocational services and support for people with intellectual and developmental disabilities.

27.    The Debtors operated numerous day treatment centers and programs in Arizona and California and operated three thrift stores in Arizona as part of a vocational training program.

5

Exhibit B

CPES provided residences and services to developmentally disabled individuals in Arizona through over 60 group homes.

28.    The Debtors also provided supportive living services where employees of the Debtors provided support services to individual members in their own homes.

29.    The Debtors' primary source of revenue was insurance reimbursements. As is routine, insurance reimbursement rates are subject to fluctuation and delay.

### The Directors and Officers Failed to Properly Address Mounting Financial Troubles

30.    The Debtors started experiencing financial distress as early as 2018, which distress continued through the Petition Date.

31.    Monson testified at a Bankruptcy Rule 2004 Examination that in 2015, 2016 and 2017 the Debtors generated revenue over $2 million per year, but that in 2018, the Debtors suffered a loss in the approximate amount of $485,000.

32.    The losses, according to the D&O Defendants, were attributable to shrinking insurance reimbursement rates for the services the Debtors provided in Arizona.

33.    Thereafter, the Debtors experienced several non-ordinary course events that further weakened their financial position.

34.    Unfortunately, the D&O Defendants completely abdicated their fiduciary duties in addressing these mounting concerns and grossly mismanaged the Debtor's financial affairs in critical times.

### The Bank of the West Line of Credit

35.    First, up and until some point in 2019 when it was unilaterally closed by the bank, the Debtors utilized a line of credit open with Bank of the West ("Line of Credit").

6

Exhibit B

36.    The Line of Credit was integral to the Debtors' management of cash flow, which was, as referenced above, comprised of unpredictable and delayed insurance reimbursements on the revenue side and regular ordinary course obligations on the expense side.

37.    By way of example, one of the Debtors' largest ordinary course expenses was payroll, which according to the books and records reviewed by the Liquidating Trustee, amounted to $2 million per pay period.

38.    Again, as a result of the unpredictable and delayed nature of their revenue, the Line of Credit was essential to the Debtors' ability to timely meet those payroll obligations, as well as other ordinary course expenses.

39.    Nevertheless, after Bank of the West closed the Line of Credit in 2019, the D&O Defendants undertook less than adequate diligence obtaining replacement financing from another financial institution.

40.    By way of example, the D&O Defendants never retained a broker, investment banker, or other professional to assist the Debtors in seeking replacement financing.

41.    Instead, the D&O Defendants presumed, without any concrete data, advice, or diligence, that no other financial institution would lend the Debtors on a secured or unsecured basis.

42.    To be certain, although the Debtors were experiencing liquidity issues, their balance sheet was healthy: the Debtors owned a number of unencumbered real estate assets that could have served as collateral for a new loan.

43.    The D&O Defendants never did obtain replacement financing for the Debtors.

7

***The Sale/Leaseback of the Debtors' Real Estate***

44.     Instead, in order to generate cash to meet operational shortfalls, the D&O Defendants authorized CPES-AZ to enter into a series of transactions where it sold between 30-32 Arizona properties (the "Properties") to CapGrow Holdings JV Sub IV LLC ("CapGrow") from 2018 through 2019 and contemporaneously leased the Properties back to continue their operations at those particular sites (collectively, the "Sale/Leaseback Transactions").

45.     The Sale/Leaseback Transactions were far outside the ordinary course of the Debtors' business.

46.     Despite the non-ordinary course nature of the Sale/Leaseback Transactions, the D&O Defendants failed to engage any professionals to advise the Debtors in connection with the transactions.

47.     That error was particularly egregious given the liquidity issues that the Debtors were experiencing. The Debtors could hardly afford to part with assets without maximizing their value. Nor could they afford to take on any further onerous obligations. Moreover, and probably because no outside professional was involved, it does not appear that the D&O Defendants gave any consideration to a sale of the enterprise at this critical juncture before parting with material assets. The Sale/Leaseback Transactions materially impaired the balance sheet of the Debtors and reduced the value achievable through any sale of the enterprise as a whole. The Sale/Leaseback Transactions also unnecessarily risked future revenue streams by subjecting the revenue generating Properties to onerous lease terms, which, once in default, could be repossessed by the landlord.

48.     By way of example, the D&O Defendants failed to retain a broker or real estate agent to assist them with the marketing and sale of the Properties, an appraiser to value the

Properties, or an accountant to conduct a feasibility study in connection with the lease obligations incurred by the Debtors in connection with the proposed Sale/Leaseback Transactions.

49.    Instead, and without the assistance of the proper professionals, the D&O Defendants solicited offers from one or two known entities (as opposed to a running an orderly sale process), exclusively relied on CapGrow's valuation of the Properties (as opposed to independently assessing the value of the Properties), and committed the Debtors to obligations beyond their ability to repay in the near-term (as opposed to negotiating affordable rental terms or financial terms tied to revenue, for example).

50.    Even though the sale of the Properties provided for an immediate cash infusion, the effects of that cash infusion were short-lived and the Debtors were back in the same financial distress situation within a relatively short period.

51.    It is clear that the D&O Defendants took the offer from CapGrow simply to address the Debtors' short-term financial problems without regard to the long-term effects, including the impact of the Sale/Leaseback Transactions on the value of the enterprise.

52.    Were it not for the imprudent and ill-advised Sale/Leaseback Transactions, the Debtors would have had significantly higher going-concern value in their efforts to sell the equity and/or assets of the enterprise.

53.    Further, as a result of the Sale/Leaseback Transactions, the Debtors no longer had significant real estate assets to secure replacement financing when Bank of the West terminated the Line of Credit.

54.    The Debtors eventually defaulted on the leases with CapGrow.

9

55.    As further evidence of the poor terms of the leases, all but three (3) of the leases with CapGrow were ultimately rejected in the bankruptcy cases, which resulted in significant lease rejection damages against the bankruptcy estates.

56.    CapGrow filed proofs of claim in the CPES-AZ bankruptcy case for unpaid lease payments and rejection damages totaling approximately $585,817.70.

### The Failed Prepetition Sale to National Mentor Health Care, LLC

57.    As a result of the D&O Defendants' previous failures to secure replacement financing and the reckless Sale/Leaseback Transactions, the enterprise was faced with no available credit and growing operating expenses.

58.    Against this backdrop (as well as the shrinking insurance reimbursement rates in Arizona), the D&O Defendants finally turned their attention to a sale of the enterprise.

59.    Unfortunately, the D&O Defendants did not act in a reasonably prudent manner in their efforts to sell the Debtors' business as a going concern.

60.    Mr. Monson testified that National Mentor Health Care, LLC ("Mentor") initially solicited him for a potential purchase of the Debtors' business operations back in 2015 when he began his employment with CPES and prior to the financial difficulties he oversaw.

61.    Emblematic of the same brazen and misguided decision-making of the D&O Defendants through the credit crunch described above, Mr. Monson further testified that, rather than retain and consult with professionals, he initiated contact with Mentor in 2019. The parties thereafter commenced negotiations.

62.    Prior to and during the Mentor sale negotiations, the D&O Defendants did not engage an investment banker or other professional sales consultant to assist with the marketing and sale of the Debtors' business as a going concern.

10

Exhibit B

63.    Nor did the D&O Defendants run a sale process.

64.    Nor did the D&O Defendants obtain a formal valuation or appraisal of the Debtors' business as a going concern.

65.    Rather, the D&O Defendants improperly relied on the 2018 ESOP valuation to value the CPES-AZ stock.

66.    The 2018 ESOP Valuation, a complex valuation created by an actuarial firm, was not a proper or reliable valuation tool for valuing a business as a going concern for a stock sale.

67.    The 2018 ESOP Valuation valued the CPES-AZ stock at approximately $12.00 per share.

68.    Mentor's initial purchase offer valued the company at approximately $15.00 per share, or roughly $13,686,525.

69.    After approximately six months of negotiations without the assistance of experienced professionals, Mentor advised the D&O Defendants that it no longer wished to pursue the sale in late March or early April of 2020.

70.    The D&O Defendants made no efforts to identify an alternative buyer for either the Debtors' equity or their assets.

### *Management's Failure to Secure CARES Act Relief*

71.    As set forth above, the Debtor's largest obligation was payroll, which cost the Debtors $2 million per pay period.

72.    Based on the Liquidating Trustee's investigation, despite widely publicized forgiveable federal loans and tax credits available to the Debtors, the D&O Defendants made little effort to secure what would have been save the enterprise funding.

73.     The Debtor's CFO, Mr. Zimmerman, testified that he was not involved in any application process.

74.     As a result, and similar to the line of credit woes discussed above, the D&O Defendants did not secure any relief on behalf of the Debtors.

75.     Nor does it appear that the D&O Defendants took any measures to address their mounting liabilities in the face of the Pandemic.

76.     This last point is important. It does not appear from the minutes of the meetings that the D&O Defendants considered any revenue maximizing alternatives or cost-cutting measures in the wake of the Pandemic. When all other businesses around the globe were scrambling to find ways to keep their businesses afloat, it does not appear that the D&O Defendants considered any such efforts.

77.     Had they engaged in any customary triage efforts whatsoever, the Debtors could have bought enough time to have engaged in an out of court sale process that would have saved at least the outsized administrative expenses attendant to the bankruptcy filings.

### *The Bankruptcy Filings*

78.     Instead, on April 24, 2023, the D&O Defendants authorized CPES-AZ's voluntary petition for relief under chapter 11 of the Bankruptcy Code (and then for CPES-AZ and Novelles at the urging of Mentor).

79.     Ultimately, Mentor purchased the assets of the Debtors out of bankruptcy for $9.35 million, a roughly thirty-two percent (32%) discount off their original purchase price for the equity.

80.     To date, the Debtors' estates have incurred $3 million in administrative expenses.

Exhibit B

81.     Were it not for the D&O Defendants' failures including their failures to engage professionals to assist them with evaluating their options for resolving their liquidity issues, formally market the equity/assets of the Debtors, and run an official sale process, the Debtors could have achieved a much higher gross sales price and avoided the attendant multiple seven figure administrative expenses resulting from the bankruptcy filings.

82.     As a direct and proximate result of the D&O Defendants' mismanagement, the Debtors were irreparably damaged.

### *The ESOP*

83.     The equity interests in CPES-AZ are held by the ESOP Plan.

84.     The ESOP Plan, initially known as the Community Psychology & Education Services, Ltd. Employee Stock Ownership Plan, was originally adopted on May 31, 1995, effective as of July 1, 1994. The ESOP Plan was subsequently amended from time to time, including an amendment effective as of July 1, 2004 and amended most recently as of April 14, 2021.

85.     The ESOP Plan is a stock bonus plan qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), and an employee stock ownership plan as defined in Section 4975(e)(7) of the Code and Section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). CPES-AZ is the plan administrator of the ESOP. See ESOP Plan § 16(h).

86.     The ESOP Plan grants the "Board", which consists of the D&O Defendants, with the authority to appoint a committee consisting of "the named fiduciaries with authority to control and manage the operation and administration of the Plan". See ESOP Plan § 16(a). In addition,

13

the Board may appoint a Trustee or Board of Trustees to hold the trust assets. See ESOP Plan § 2.

87.    The ESOP Plan provides that the ESOP Committee shall be the named fiduciaries under ERISA "with the authority to control and manage the operation and administration of the Plan". See ESOP Plan § 16(a). The ESOP Committee is permitted to act by written consent without the need for a meeting and specifically provides that an ESOP Committee member cannot vote on any action that will impact the member individually. See ESOP Plan, § 16(b). The Secretary of the ESOP Committee is charged with keeping a record of the ESOP Committee's records and documents relating to the administration of the ESOP Plan.

88.    The ESOP Plan documents establish the interplay of the roles between internal and external Trustees of the ESOP and the Board. In particular, the Board has delegated the fiduciary duties under ERISA to the ESOP Committee.

89.    The ESOP Plan provides that the ESOP Committee has the vast majority of the ESOP's administrative powers, including: (1) determining the appropriate allocations to Participants' accounts; (2) determining the amount of benefits payable to a Participant (or Beneficiary) and the time and manner in which such benefits are to be paid; (3) directing with the Trustee for crediting and distribution of the Trust's assets; (4) reviewing the performance of the Trustee with respect to the Trustee's administrative duties, responsibilities, and obligations under the ESOP Plan and ESOP Plan Trust Agreement (the "ESOP Trust Agreement"); and (5) selecting an independent appraiser and determining the Fair Market Value of CPES Stock as of such dates as it determines to be necessary or appropriate. See ESOP Plan, § 16(c)(1)-(11) (setting forth the powers of the ESOP Committee).

14

Exhibit B

90.    The ESOP Trust Agreement and the ESOP Plan delegate the appointment and removal of the ESOP Trustee to the Board as a whole and not just the ESOP Committee. See ESOP Trust Agreement, M.

91.    Comparatively, the Trust Agreement identifies the powers delegated to the ESOP Trustee, all of which deal with the ESOP Trustee's control of the Trust's assets including the following powers: (1) to contract or otherwise enter into transactions for the purpose of selling CPES-AZ Stock; (2) vote any stock held in the Trust; (3) sell, transfer, mortgage, pledge, lease or otherwise dispose of or grant options with respect to any Trust Assets at public or private sale; (4) participate in reorganizations, recapitalizations, consolidations, mergers and similar transactions with respect to CPES-AZ Stock or any other securities; (5) sue, defend, compromise, arbitrate or settle any suit or legal proceeding or any claim due it or on which it may be liable; and (6) perform all acts which the Trustee shall deem necessary or appropriate to exercise the powers and authority of the Trustee. See Trust Agreement, N(1)-(10) (outlining the powers of the ESOP Trustees).

92.    Prior to 2016, the Board had appointed a Board of Trustees (the "Board of Trustees") to administer and act as the ERISA named fiduciaries for the ESOP Plan. In 2016, the Board decided to appoint two trustees to jointly serve and administer the Plan, namely Greenhow and Theresa Thienhaus ("Thienhaus" and together with Greenhow, collectively the "Internal Trustees").

93.    The Board then appointed an ESOP Committee to also serve as named fiduciaries in administering the ESOP Plan. In 2019, the ESOP Committee determined it was in the best interest of the participants (collectively, the "ESOP Participants") to transition to a professional, external trustee to administer the ESOP Plan.

15

Exhibit B

94.     The D&O Defendants had several fiduciary duties under ERISA with respect to the ESOP.

95.     Beginning in 2016, the Board delegated the control, management, and administration of the ESOP to the ESOP Committee and appointed the Internal Trustees.

96.     Then, in or around April 2019, the ESOP Committee and the Board approved the hiring of an external trustee for the ESOP, namely, Alberto Tarajano (the "Former ESOP Trustee").

97.     In May 2020, Mr. Tarajano resigned and the Board and the ESOP Committee approved the hiring of Miguel Paredes (the "Current ESOP Trustee").

98.     The ESOP Trustee and the ESOP Committee are the Named Fiduciaries under the ESOP Plan and ESOP Trust Agreement. However, upon information and belief, the Board is a functional fiduciary under ERISA due to its responsibilities under the ESOP Plan documents in appointing the ESOP Committee and the various ESOP Trustees. Further, outside from the delegated responsibilities, both the Board and the ESOP Committee had a responsibility to monitor any delegated duties to the then-appointed trustee.

### *The Faulty 2018 ESOP Plan Stock Valuation*

99.     By the time Mr. Tarajano was engaged as the external ESOP Trustee, the draft ESOP Plan valuation for the year ending in 2018 was in process.

100.     The Internal Trustees generally testified at their Bankruptcy Rule 2004 Examinations that during the yearly valuation process they would typically review the draft valuation report prepared by the independent actuarial firm, Brueggeman Johnson Yeanoplos, PC ("BJY") and then ask questions or challenge any findings directly with BJY.

16

Exhibit B

101.    When Tarajano was hired, he reviewed the draft 2018 valuation and had concerns regarding the method of valuation used by BJY. Monson testified that Mr. Tarajano reviewed the net assets of the Debtors and then worked with BJY on formulating a different share price based on the asset valuation approach.

102.    The Debtors had traditionally valued the ESOP Plan stock using an income approach method of valuation. Tarajano changed the valuation methodology to the asset approach for the 2018 ESOP Plan valuation.

103.    During Tarajano's Bankruptcy Rule 2004 examination, Tarajano further explained the analysis and reasoning underlying the change in valuation approach. He explained that "by accepting a [$]5.92 draft share value, if the assets of the business were worth $12 a share and you have an offer on the table for [$]10, and you got plant, property, and equipment worth [$]7.92, would it be in the participant's best interest to accept a share value of [$]5.92 a share?....[H]ad this [initial draft] value been accepted, I think it would have been inconsistent with my [fiduciary] duties under oath."

104.    The ESOP Committee was provided the draft 2018 ESOP Plan valuation and during a meeting on June 6, 2019, the share valuation for 2018 was presented to the ESOP Committee for review with Greenhow presenting on the price being set based on an asset-based valuation. See ESOP Committee Meeting Minutes dated June 6, 2019.

105.    Despite the Meeting Minutes showing that the ERISA Fiduciaries were aware of the change in valuation approach, the ERISA Fiduciaries had varying degrees of knowledge as to the valuation method selection process and therefore it is believed and averred that all members of the ESOP Committee were not fully knowledgeable when the decision was made to set the share price for 2018.

17

106.    Further, the lack of understanding of the various delegated roles and responsibilities under the ESOP Plan documents demonstrates potential problems with the ERISA Fiduciaries. For example, Johnson, in his Bankruptcy Rule 2004 examination, testified that Mr. Tarajano selected the valuation methodology based on the offer price from the Mentor offer.

107.    The change in the valuation approach for the 2018 ESOP Plan valuation resulted in an overvaluation of the ESOP Plan stock. The Debtors subsequently made distributions to certain ESOP Participants using the 2018 ESOP Plan valuation which resulted in a loss to the ESOP Plan.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (*D&O Defendants*)

108.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

109.    The D&O Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties under applicable state corporate law.

110.    These duties required the D&O Defendants to at all times perform their duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances and to subordinate their own personal interests to the interests of the Debtors.

111.    Those duties also required the D&O Defendants to seek to reasonably maximize corporate value, and to preserve maximum corporate value for distribution to creditors and shareholders in the order of their priority.

112.    The D&O Defendants breached their fiduciary duties to the Debtors by, inter alia:

18

a.  Failing to undertake reasonable and prudent efforts to obtain replacement financing after the Line of Credit was terminated;

b.  Failing to undertake reasonable and prudent efforts to address liquidity concerns resulting from the termination of the Line of Credit, including entering into the Sale/Leaseback Transactions without professional guidance;

c.  Failing to undertake reasonable and prudent efforts in connection with the sale of the Debtors' enterprise prior to the Petition Date, including running an orderly sale process and valuing the assets and equity of the enterprise;

d.  Failing to undertake reasonable and prudent efforts to secure CARES Act relief for the benefit of the Debtors;

e.  Failing to undertake reasonable and prudent efforts and impose sufficient controls to maximize revenue and minimize expenses in light of the Pandemic; and

f.  Failing to evaluate and consider alternatives to bankruptcy that could have reduced the administrative expenses associated with the sale of the Debtors' business.

113.  Each of the foregoing grossly negligent failures is highlighted by equally grossly negligent and contemporaneous failures to take the customary and prudent step of retaining and consulting with professionals to assist the Debtors in addressing each of the non-ordinary course business transactions.

114.  The failure of the D&O Defendants to discharge their fiduciary duties inflicted serious harm on the Debtors and was a contributing factor causing the Debtors to file for bankruptcy.

115.    As a result, the D&O Defendants' breaches of the fiduciary duties have therefore damaged the Debtors and their business in an amount to be determined at trial, including, but not limited to:

    a.    The reduction in gross sale price achieved through the bankruptcy asset sale to Mentor versus the prepetition equity transaction with the same buyer totaling at least $4.3 million;

    b.    The rejection damages claimed by CapGrow resulting from the leases negotiated by the D&O Defendants in the Sale/Leaseback Transactions totaling $585,817.70;

    c.    The CARES Act relief that the D&O Defendants failed to secure totaling at least $2 million; and

    d.    The administrative expenses incurred by the estates totaling in excess of $3 million.

## COUNT II
## AIDIND AND ABETTING BREACH OF FIDUCIARY DUTY
### (*D&O Defendants*)

116.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

117.    The D&O Defendants in their respective capacities as directors, executive officers, and/or employees of the Debtors, each individually owed the Debtors fiduciary duties under applicable state corporate law.

118.    In the alternative to Count I, the D&O Defendants had actual knowledge of and rendered substantial assistance to the breached of fiduciary duty committed by the other D&O

Exhibit B

Defendants which proximately caused damage to the Debtors, including all of the acts alleged in Count I.

119.    The significant damages that directly resulted from these acts and omissions exceed $10 million and include, but are not necessarily limited to the damages claimed in Count I.

## COUNT III
### BREACH OF FIDUCIARY DUTY TO ACT PRUDENT AND IN ACCORDANCE WITH THE PLAN DOCUMENTS
### (*ERISA Fiduciary Defendants*)

1.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

2.    ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of:

(i)providing benefits to participants and their beneficiaries; and

(ii)defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments …..

3.    The ERISA Fiduciary Defendants owe statutory fiduciary duties under ERISA to the ESOP.

Exhibit B

4.      The ERISA Fiduciary Defendants have a duty to act prudently with respect to their ERISA duties.

5.      The ERISA Fiduciary Defendants did not have clear knowledge and understanding of their fiduciary duties under ERISA.

6.      The ERISA Fiduciary Defendants failed to properly delegate duties and responsibilities between the ESOP Trustees and the ESOP Committee.

7.      Some, if not all the former members of the ESOP Committee, clearly did not see a role or the importance of the ESOP Committee generally, despite being ERISA Fiduciary Defendants.

8.      Additionally, there were disagreements between the roles of the various fiduciaries in general.  For example, the Plan provides that the ESOP Committee is responsible for setting the fair market value of CPES Stock.  However, the Internal Trustees and the Prior ESOP Trustee all had differing views during their Bankruptcy Rule 2004 Examinations on who set the share price. Ms. Greenhow testified that the independent audit firm set the share price based on the information provided; whereas Mr. Tarajano testified that he shared his observations of the initial audit report with the ESOP Committee who ultimately set the share price based on those observations.

9.      There was at all times relevant hereto a misunderstanding as to the specific delegation of the specific duties among the various parties and the administration of the ESOP Plan was required to be conducted pursuant to the Plan Documents.

10.      Further, the fact that former ESOP Committee member, Foust, claims that the ESOP Committee was essentially illusory demonstrates that the ERISA Fiduciary Defendants were not truly acting prudently in performing their responsibilities to the ESOP Participants.

22

Exhibit B

11.    As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the Debtors to suffer damages.

12.    As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the CPES ESOP to suffer damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY TO MONITOR ESOP FIDUCIARIES
### (*ERISA Fiduciary Defendants*)

13.    Plaintiff repeats and re-alleges each of the allegations as set forth above and below and is set forth herein.

14.    The ERISA Fiduciary Defendants were unaware of the delegation of responsibilities under the ESOP Plan Documents, the role of the ESOP Committee, and the overall understanding of matters, such as the valuation methods used by BJY.

15.    In particular, Foust's lack of facts and personal knowledge further substantiates the Liquidating Trustee's conclusions made here from the Bankruptcy Rule 2004 examinations and review of the meeting minutes provided.

16.    To the extent the ERISA Fiduciary Defendants were uninformed as to the change in the traditional ESOP Plan valuation method or the implications of the change in the valuation method, they failed to appropriately monitor Tarajano.

17.    The failure to properly monitor Tarajano, and to allow him to change the valuation methodology for the ESOP Plan resulted in an overvaluation of the ESOP Plan stock and an overpayment to certain ESOP Plan participants.

18.    As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the Debtors to suffer damages.

23

Exhibit B

19.    As a result of these actions, or inactions, the ERISA Fiduciary Defendants caused the ESOP to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, the Liquidating Trustee respectfully demands judgment as follows:

A.    Entry of judgment against the Defendants in an amount to be determined at trial;

B.    Awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

C.    Awarding post-judgment interest at the maximum rate permitted by law; and

D.    Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: _____, 2023.

Respectfully submitted,

_DRAFT_____
ERIC J. SILVER, ESQ.
Florida Bar Number 057262
esilver@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street
Museum Tower, Suite 2200
Miami, Florida 33130
Telephone:    (305) 789-3200
*Counsel to Oxford Restructuring Advisors, LLC as*
*Liquidating Trustee for the CPES Liquidating Trust*

24

#11786785 v1

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Eric J. Silver
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-4175
Fax: (305) 789-2688
Email: esilver@stearnsweaver.com

*Via Federal Express*
*To addressees set forth on the attached Exhibit A*

Re:　**CLAIM/DEMAND FOR PAYMENT**

Named Entities:　(1) Community Provider of Enrichment Services, Inc.
(2) Novelles Developmental Services, Inc.
(3) CPES California, Inc.

Insurance Policies:　(a) Hudson Insurance Group
Policy No. HFP-HN-PRP-5390-010120
(b) Westchester Fire Insurance Company
Policy No. G27072574 007

Ladies and Gentlemen:

Our office is special litigation counsel to Oxford Restructuring Advisors, LLC, as Liquidating Trustee of the CPES Liquidating Trust (the "Plaintiff" or "Liquidating Trustee"), appointed by the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") pursuant to that certain *First Amended Joint Chapter 11 Plan of Liquidation* ("Plan"), as Modified (Docket No. 646) and confirmed by order of the Bankruptcy Court dated May 10, 2021 (the "Confirmation Order") (Docket No. 836) in the jointly administered chapter 11 bankruptcy cases currently styled *In re CPES-AZ Liquidating, Inc.*, et al., Case No. 9:20-bk-10554-DS (the "Bankruptcy Cases"). This correspondence provides the former officers and directors of CPES-AZ Liquidating, Inc., f/k/a Community Provider of Enrichment Services, Inc. d/b/a CPES, Inc. ("CPES-AZ"), NDS Liquidating, Inc., f/k/a Novelles Developmental Services, Inc. ("Novelles") and CPESCA Liquidating, Inc. f/k/a CPES California, Inc. ("CPES-CA," and together with CPES-AZ and Novelles, the "Debtors") as well as fiduciaries of the CPES Employee Stock Ownership Trust in accordance with the CPES Employee Stock Ownership Plan (the "ESOP Plan") with further notice of a Claim (as defined in the Policies). The fiduciaries, including you and those individuals and addressees named herein and on Exhibit A hereto, are collectively referred to as the "Insureds." This notice supplements the claims previously made against the Insureds on October 27, 2020 and December 28, 2020. By virtue of the Plan and Confirmation Order, the Liquidating Trustee now controls the claims previously asserted against the Insureds.

MIAMI ▪ TAMPA ▪ FORT LAUDERDALE ▪ TALLAHASSEE ▪ CORAL GABLES

June 27, 2023
Page 2

**Background**

For years, the Debtors operated as behavioral health services companies. Their business activities included providing outpatient mental health services, intensive therapy programs, employee assistance program services, individual and group counseling, addiction recovery programs, child and family services, foster care, training vocational services and support for people with intellectual and developmental disabilities. The Debtors also provided in-home services to clients. Operations covered territories in Arizona and California. In Arizona, in particular, the Debtors owned (a) three (3) thrift stores that served as vocational training programs and (b) over sixty (60) group homes.

Organizationally, at all relevant times, Debtors Novelles and CPES-CA were wholly owned subsidiaries of CPES-AZ. In turn, CPES-AZ's equity was wholly owned by the ESOP Plan. Corporate governance of CPES-AZ and the ESOP Plan for all relevant periods is set forth in the following demonstrative table:

| Insured Name | Fiduciary Role(s) | Entity |
|---|---|---|
| Mark Monson | President and CEO | CPES-AZ |
| Mark Monson | ESOP Plan Committee | ESOP Plan |
| David Johnson | Chairman of the Board | CPES-AZ |
| Douglas Zimmerman | CFO | CPES-AZ |
| Michele Ferrall | Director and VP Operations | CPES-AZ |
| Tiki Thompson | Director and VP Operations | CPES-AZ |
| Mary Lynn Greenhow | Secretary and VP Admin | CPES-AZ |
| Mary Lynn Greenhow | ESOP Plan Trustee | ESOP Plan |
| Cathy Hunt | Director | CPES-AZ |
| Ron Barber | Director | CPES-AZ |
| Charles Foust, Jr. | ESOP Plan Committee | ESOP Plan |
| Nancy Grove | ESOP Plan Committee | ESOP Plan |
| Alberto Tarajano | ESOP Plan Trustee | ESOP Plan |

According to the Liquidating Trustee's investigation, including a review of the books and records of the Debtors, minutes of the meetings of the Board of Directors and the ESOP Plan Committee, informal interviews and Bankruptcy Rule 2004 examinations of many of the Insureds, the Liquidating Trustee has identified a number of actions in which the Insureds breached their fiduciary duties.

**The Insureds' Failure to Exercise Fiduciary Duties**

As the financial climate tightened for the Debtors' operations in Arizona, evidence shows that the Insureds paid little heed to the turbulent headwinds and did not engage a single professional to assist in their decision-making process, or lack thereof.

June 27, 2023
Page 3

### The Insureds' Failure to Secure Financing

For example, when Bank of the West terminated the Debtors' line of credit, the Insureds did not retain, or even consider retaining, a professional to assist the Debtors in securing replacement financing. Indeed, evidence shows that the Insureds made little to no effort to secure such replacement financing on their own. Even though the Debtors historically operated at a $2 million profit, their revenue was almost entirely dependent on insurance reimbursements, which by their nature occur on a time lag. A line of credit smooths the bumps in an unpredictable revenue stream and allows a company to timely process expenses, including, critically for these Debtors, payroll. That the Insureds made little effort to replace the line of credit was grossly negligent in light of their revenue and expenses.

### The Insureds' Grossly Negligent Sale/Leaseback Transactions

Instead, the Insureds, without the assistance or advice of a real estate broker or investment banker, entered into a series of transactions whereby they sold roughly 30 of the Arizona properties and leased back the premises from the buyer. To be certain, the sale transactions provided a much needed cash injection to the business. But the transactions were also reckless and/or grossly negligent. The Insureds might as well have gone to a check cashing store.

It is worth repeating that the sale/leaseback transactions were done without the advice or assistance of experts. There were no contemporaneous appraisals. There was no competitive bidding process or any sale process for that matter. The lease terms, which locked the Debtors into continuing liabilities of massive proportion, were negotiated without due concern for the troubled operations and their ability to meet the obligations as they became due. No accountants or other professionals were retained to provide financial projections and advise the Insureds on the financial wherewithal of the companies to satisfy the lease obligations (along with their other operating expenses). And, of course, because the Debtors sold their assets, which were free and clear of liens, claims and encumbrances at the time of the sale, they no longer possessed collateral to post in connection with replacement financing. The posting of security should have driven down the expense of any such replacement financing, as well. Moreover, the divestment of the fee interest in their real estate portfolio materially impacted the going concern value of the enterprise.

### The Insureds' Failed Sale Efforts

Making matters worse, and along the same lines of the Insureds' failure to retain professionals or run a formal process, the Insureds (and namely Mr. Monson) directly contacted a would-be suitor to purchase the stock of CPES-AZ in 2019. Again, the Insureds failed to engage an investment banker or other professional sales consultant to assist with the marketing and sale of the Debtors' business as a going concern. Nor did they obtain a formal valuation or appraisal. Instead, the Insureds improperly relied on the 2018 ESOP valuation created by an actuarial firm, which appraised the value of the firm at $12.00 per share to evaluate a purchase proposal from the only suitor with whom the Debtors engaged in negotiations. Mentor's initial offer was $15.00 per share (or roughly $13.68 million). Even at that price well above their sole reference point, the Insureds

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

June 27, 2023
Page 4

could not close the deal. To be certain, there were other potential pre-bankruptcy suitors for the Debtors, but the Insureds chose not pursue those alternatives. Ultimately, the would be suitor bought the assets of CPES-CA and Novelles for $9.35 million in bankruptcy (roughly 68% of the pre-bankruptcy offer).

<em>The Insureds' Failure to Secure CARES Act Assistance</em>

Faced with increased obligations, no financing, and depleted assets, the Debtors and the Insureds were confronted by yet another financial storm: the COVID-19 Pandemic. Naturally, the Pandemic restricted the Debtors' ability to provide services to its patients, which, in turn, further constrained their diminished revenue streams. This made it almost impossible for the Debtors to meet their largest obligation: payroll, to the tune of $2 million per pay period. Unfortunately, despite the well-publicized availability of forgivable federal government loans and tax credits for payroll, the Insureds, on behalf of the Debtors, made little effort to secure such financing. Indeed, the Debtors' CFO, Mr. Zimmerman, testified that he was not involved in any application process for payroll assistance. That, in and of itself, is demonstrative of how little due care the Insureds gave to the Debtors during these critical financial times. As a result, the Debtors' operations were at critical risk of being shut down by the State of Arizona. The evidence also shows that the Insureds did little to nothing to reduce expenses or increase revenue during Pandemic, despite knowing that minimum wage increases coupled with static insurance reimbursement rates were eliminating operating surpluses and leading to growing cash losses. That lack of control is also actionable.

<em>The Insureds' Reckless Bankruptcy Filings</em>

As a direct and proximate result of the foregoing breaches of fiduciary duties, the Debtors assets were depleted and their obligations increased. The Insureds made little to no effort to secure financing to cover ongoing operational liabilities. According to Bankruptcy Rule 2004 testimony, the Debtors projected to run out of cash by June, 2020. Again, confronted with another opportunity to retain professionals to run an orderly out of court sale process to preserve the value of the enterprise, the Insureds elected to file for relief under the Bankruptcy Code. The Debtors ultimately filed a chapter 11 (first for CPES-AZ, and then for CPES-CA and Novelles when the prepetition suitor urged those filings). They ran the sale process in the bankruptcy case, which not only netted a fraction of what was negotiated by the same buyer prepetition, but resulted in exorbitant professional fees in excess of $3 million to date.

**The ERISA Fiduciaries[1] Failure to Monitor**

In addition to the foregoing derivative claims, by virtue of the Plan and Confirmation Order, the Liquidating Trustee is authorized to bring derivative claims on behalf of the ESOP. Those include the ESOP overvaluation claims that are subject of the previous claim letters and which are incorporated here by reference. The claims consist of, *inter alia*, the ERISA Fiduciary Defendants failure to act prudently with respect to their ERISA duties and failure to properly delegate duties

---

[1] The ERISA Fiduciaries consist of the Board of Directors, the ESOP Plan Committee and Alberto Tarajano.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

June 27, 2023
Page 5

and responsibilities between the ESOP Trustees and the ESOP Committee and the failure  as the prior outside ESOP Trustee. . The ERISA Fiduciaries actions, or inactions, in this instance were reckless and consisted of grossly negligent conduct, which is apparent because they did nothing to encourage or stop that conduct from occurring. Both the overvaluation claim and failures discussed supra must be examined in that light.

**The Liquidating Trustee Holds Substantial Claims Against the Insureds**

Under applicable law, each of the Insureds owed the Debtors (or the ESOP as applicable) fiduciary duties, including duties of care and loyalty. As a result of the decisions and actions of the Insureds, the Debtors' estates suffered significant losses and damage. In connection therewith, and as described in more detail above, the Insureds breached their fiduciary duties to the Debtors (or the ESOP as applicable) by, among other things, the following:

- Failing to engage professionals and advisors to assist and inform the Board in efforts to (i) secure financing to meet ongoing obligations, (ii) run a sale process to maximize value, (iii) value the company's real estate assets, (iv) negotiate leaseback transactions or evaluate the Debtors' ability to meet those future liabilities, (v) value the company and run a sale process in connection with the equity transaction, and (vi) secure CARES Act relief.
- Failing to consider alternatives to bankruptcy or take action to avoid bankruptcy and the attendant expenses associated therewith.
- Failing to act timely to mitigate or remedy known problems involving Assignors' business and financial operations.
- Failing to impose sufficient controls of the Debtors' financial and business operations that would reduce expenses and increase profit during the Pandemic.
- Overvaluing the 2018 ESOP.

As a direct and proximate result of the breaches set forth above, the Debtors and ESOP have suffered significant losses that are expressly covered by the Policies. The losses suffered by the Debtors and ESOP are far in excess of $10 million, including, but not limited to, at least $4.3 million for the reduction in sale price achieved through bankruptcy, over $500,000 in lease rejection damages resulting from the leaseback transactions, roughly $2 million for the failure to secure at least one pay period of forgivable CARES Act relief, in excess of $3 million for the professional fees incurred in the Bankruptcy Cases, and the multiple million dollar losses incurred for the ESOP overvaluation and the undervalued prepetition asset sale transaction. As such, immediate demand is hereby made for the payment of the full amount of the proceeds of the Policies to cover the claims of loss sustained by the Debtors and ESOP. Barring receipt of payment in the amount of $8 million or scheduling a mediation in the near term with all Insureds and Insurers to occur on or before September 30, 2023, the Liquidating Trustee will commence litigation against the Insureds.

In order to assist you in evaluating the claims, we have enclosed a copy of the draft complaint the Liquidating Trustee will authorize us to file (attached as Exhibit B).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

June 27, 2023
Page 6

Because the Liquidating Trustee's investigation is ongoing, it reserves the right to supplement and/or amend this claim as new information becomes available to the extent such is necessary or appropriate under the terms of the Policies or applicable law.

Sincerely,

/s/ Eric J. Silver, Esq.

Enclosures

cc:    *Via Email*

Ruth McBrayer (rmcbrayer@crestins.com)
Jon Beaty (jbeaty@crestins.com)
Lara Abrahao (labrahao@hudsoninsgroup.com)
Hudson Insurance Group (Hudson_Claims@hudsoninsgroup.com)

*Via Federal Express, Facsimile and Email*

| | |
|---|---|
| Crest Insurance Group, LLC<br>5285 E. Williams Circle, Suite 4500<br>Tucson, AZ 85711<br>(f) 520.325.3757<br>newclaims@crestins.com | |
| Hudson Financial Products<br>ATTN: **Claims Department**<br>100 William Street<br>New York, NY 10038<br>HFP-Claims@HudsonInsGroup.com | Hudson Financial Products<br>ATTN: **Underwriting**<br>100 William Street<br>New York, NY 10038<br>HFP-PrivateUnderwriting@HudsonInsGroup.com |
| Westchester Specialty Group<br>PO Box 5119<br>Scranton, PA 18505-0549<br>(f) 215.640.5040<br>ChubbClaimsFirstNotice@Chubb.com | Westchester Specialty Group<br>Attention: Professional Liability Dept.<br>Royal Centre Two<br>11575 Great Oaks Way, Suite 200<br>Alpharetta, GA 30022 |

June 27, 2023
Page 7

## Exhibit A
### *CPES Fiduciaries*

| | | |
|---|---|---|
| David Johnson<br>3410 N Camino De Vista<br>Tucson, AZ 85745 | Mark Monson<br>12375 E Lou Bock Pl<br>Tucson, AZ 85749 | Douglas Zimmerman<br>4690 N Belgravia Rd<br>Tucson, AZ 85704 |
| Michele Ferrall<br>311 W Church St<br>Santa Maria CA 93458 | Ron Barber<br>4848 E Hawthorne St<br>Tucson, AZ 85711 | Tiki Thompson<br>16427 Strongwood Lane<br>Fontana CA 92336 |
| Mary Lynn Greenhow<br>2119 E Spring St<br>Tucson AZ 85719 | Nancy Grove<br>7596 Oliver Ave<br>Tucson AZ 85741 | Cathy Hunt<br>4151 N Palisade Dr<br>Tucson, AZ 85749 |
| Alberto Tarajano<br>260 Crandon Blvd #32-124<br>Key Biscayne, FL 33149 | Charles Foust, Jr.<br>6342 West Desert Laurel Lane<br>Tuscon Arizona 85757 | |

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

#11814051 v1